1  CHRISTOPHER J. BANKS (Bar No. 218779)
   HERMAN J. HOYING (Bar. No. 257495)
2  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
3  San Francisco, California  94105-1126
   Telephone:     415.442.1000
4  Facsimile:     415.442.1001
   cbanks@morganlewis.com
5  hhoying@morganlewis.com

6  ILONA M. TURNER (Bar No. 256219)
   JENNIFER ORTHWEIN (Bar No. 255196)
7  SHAWN THOMAS MEERKAMPER (Bar No. 296964)
   TRANSGENDER LAW CENTER
8  1629 Telegraph Ave, Suite 400
   Oakland, CA 94612
9  Telephone:     415.865.0176
   Facsimile:     877.847.1278
10 ilona@transgenderlawcenter.org
   jen@transgenderlawcenter.org
11 shawn@transgenderlawcenter.org

12 *Attorneys for Plaintiff*
   MICHELLE-LAEL B. NORSWORTHY (a/k/a JEFFREY
13 B. NORSWORTHY)

14

15                   UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17

18 JEFFREY B. NORSWORTHY (a/k/a          Case No. 3:14-cv-00695-JST
   MICHELLE-LAEL B. NORSWORTHY),
19                                       **FIRST AMENDED COMPLAINT**
                      Plaintiff,
20
                      vs.
21
   JEFFREY BEARD; A. NEWTON; A.
22 ADAMS; LORI ZAMORA; RAYMOND
   J. COFFIN; MARION SPEARMAN;
23 DAVID VAN LEER; JARED LOZANO;
   and DOES 1-30,
24
                      Defendants.
25

26

27

28

MORGAN, LEWIS &
  BOCKIUS LLP
 ATTORNEYS AT LAW
  SAN FRANCISCO

Plaintiff Michelle-Lael B. Norsworthy (a/k/a Jeffrey B. Norsworthy) ("Plaintiff" or "Norsworthy") for her Complaint against Defendants Jeffrey Beard, A. Newton, A. Adams, Lori Zamora, Raymond J. Coffin, Marion Spearman, David Van Leer, Jared Lozano and Does 1-30, alleges as follows:

## NATURE OF THIS ACTION

1.      Plaintiff brings this civil rights action under 42 U.S.C. § 1983 to seek prospective injunctive relief based upon Defendants' failure to provide Plaintiff with medically necessary surgery in violation of the Eighth and Fourteenth Amendments to the United States Constitution and failure to allow Plaintiff to pursue a legal name change also in violation of the Eighth and Fourteenth Amendments.

## PARTIES

2.      Plaintiff Michelle-Lael Bryanna Norsworthy is a citizen of California currently housed at Mule Creek State Prison in Ione, California by the California Department of Corrections and Rehabilitation ("CDCR").  Plaintiff has been incarcerated under the custody of the CDCR since on or around April 15, 1987.  Plaintiff is a transsexual woman – an individual whose gender identity is different from the male gender assigned to her at birth, who requires medical treatment to better conform her body to that gender identity.  She experiences severe dysphoria and distress resulting from the incongruence between her male physical features and her female gender identity.  Plaintiff has been living as a female since the mid-1990s and has received feminizing hormone therapy and chemical castration treatments since 2000.  As a result, plaintiff is a biological female based upon her estrogen and testosterone levels, yet Defendants have refused to allow Plaintiff to obtain medically necessary surgery to further her treatment.

3.      Upon information and belief, Defendant Dr. Jeffrey Beard ("Beard") is a resident of California.  Since his appointment by Governor Edmond G. Brown, Jr. on December 27, 2012, Beard has served as Secretary of the CDCR.  In his position as Secretary, Beard has ultimate responsibility and authority for the operation of the CDCR, including the administration of health care and the execution of policies governing medical care and name changes.

4.      Upon information and belief, Defendant A. Newton ("Newton") is a resident of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

California.  Upon information and belief, at all relevant times, Newton was an agent or employee of the CDCR with the title "SRN II" and was charged with evaluating certain appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.  Upon information and belief, A. Newton is currently employed by the CDCR at Salinas Valley State Prison in Soledad, California.

5.      Upon information and belief, Defendant A. Adams ("Adams") is a resident of California.  Upon information and belief, at all relevant times, Adams was an agent or employee of the CDCR with the title "CME" and was charged with evaluating certain second level appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.  Upon information and belief, A. Adams is currently employed by the CDCR at the Correctional Training Facility in Soledad, California.

6.      Upon information and belief, Defendant Lori Zamora ("Zamora") is a resident of California.  Upon information and belief, at all relevant times, Zamora was Chief of the CDCR Office of Third Level Appeals-Health Care with the authority to grant or deny the relief requested in the appeals.

7.      Upon information and belief, Defendant Raymond J. Coffin ("Coffin") is a resident of California.  Upon information and belief, at all relevant times, Coffin was the Chief Psychologist at the California Substance Abuse Treatment Facility and State Prison in Corcoran, California and an employee of the CDCR charged with evaluating the merits of certain inmates' claims of inadequate medical care.

8.      Upon information and belief, Defendant Marion Spearman ("Spearman") is a resident of California.  At all relevant times, Spearman was the Warden for the California Correctional Training Facility located in Soledad, California, at which facility Plaintiff was housed when the CDCR decisions at issue here were made. As warden, Spearman is responsible for reviewing and approving or denying an inmate's request for a legal name change.

9.      Upon information and belief, Defendant David Van Leer ("Van Leer") is a resident of California.  Upon information and belief, at all relevant times, Van Leer was an

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

Appeals Examiner for the CDCR with responsibility for reviewing and approving or denying the appeal of the denial of an inmate's request for a legal name change.

10.     Upon information and belief, Defendant Jared Lozano ("Lozano") is a resident of California.  Upon information and belief at all relevant times, Lozano was the Chief of the Office of Appeals for the CDCR with responsibility, among other things, for reviewing and approving or denying the appeal of the denial of an inmate's request for a legal name change.  Upon information and belief, Lozano is currently employed by the CDCR at the California Health Care Facility in Stockton, California.

11.     Does 1-30 are unnamed agents or employees of CDCR that participated in the decision to deny Plaintiff medical care and/or the right for Plaintiff to seek a legal name change.

12.     Plaintiff reserves the right, consistent with applicable rules and orders, to amend this Complaint to include other officials should it become apparent that those officials' inclusion is necessary to grant the prospective injunctive relief requested herein.

## JURISDICTION

13.     This court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 1331 and 1343(a)(3).

14.     Venue is appropriate in this judicial district pursuant to 42 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim occurred in the Northern District of California.

## FACTUAL BACKGROUND

### I.     PLAINTIFF'S PERSONAL HISTORY WITH GENDER DYSPHORIA

15.     Plaintiff was born in 1964 in Detroit, Michigan.  While Plaintiff was still an infant, her parents divorced and Plaintiff was sent to live with her grandmother.  Approximately ten years later, Plaintiff's mother retook custody of Plaintiff and moved the family to the West Coast, eventually settling in California.  Throughout childhood and adolescence, Plaintiff never felt comfortable in the male gender assigned to her at birth.  Plaintiff attempted to overcompensate for feeling weak and less than a man as a result of Plaintiff's feminine characteristics and gender

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

1   identity confusion by acting out aggressively, owning guns and turning to alcohol.  At sixteen,

2   Plaintiff dropped out of high school and moved to Hollywood, California, eventually working as

3   a police informant in her late teens and joining the military.

4        16.    On December 4, 1985, Plaintiff encountered a male acquaintance at a bar in

5   Fullerton, California with whom Plaintiff had a contentious history due to Plaintiff's work as an

6   informant.   Both intoxicated, an argument began in the bar and Plaintiff left the bar to go to

7   Plaintiff's car.  The acquaintance followed Plaintiff to the car, and Plaintiff retrieved a loaded

8   rifle from the car.  Plaintiff fired a warning shot but the acquaintance reached for the gun and a

9   struggle ensued.  During the struggle, the acquaintance was shot in the neck.  Plaintiff

10   immediately attempted to administer first aid and, upon police arriving, stated "I shot my friend."

11   The acquaintance was taken to the hospital, but died a few days later as the result of a blood clot

12   from the gunshot wound.  Plaintiff was convicted of second degree murder and sentenced to

13   seventeen years to life.  Plaintiff has been under the custody of CDCR since on or about April 15,

14   1987 and currently is housed at Mule Creek State Prison in Ione, California.

15        17.    Since at least adolescence Plaintiff has experienced significant distress and anxiety

16   as a result of the discrepancy between the male sex assigned to her at birth and her own female

17   gender identity.  In the 1990s, Plaintiff's feelings and understandings surrounding her gender

18   began to consolidate and Plaintiff came to understand and accept that she is a transsexual woman.

19        18.    In 1999, Plaintiff underwent several weeks of testing by a psychologist, Dr. Carl

20   Viesti, at a CDCR facility.  "The results of all test instruments were consistent with the profile of

21   a transsexual" and Plaintiff was diagnosed with gender identity disorder – "the only DSM-IV

22   diagnosis available for this condition."  Subsequent to Plaintiff's initial diagnosis, the American

23   Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of

24   Mental Disorders ("DSM-V") in 2013, which replaced the "gender identity disorder" diagnosis

25   with "gender dysphoria."  The DSM-V characterizes the diagnosis of gender dysphoria as

26   follows:  "[i]ndividuals with gender dysphoria have a marked incongruence between the gender

27   they have been assigned to (usually at birth, referred to as *natal gender*) and their

28   experienced/expressed gender." Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of</u>

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

Mental Disorders 453 (5th ed. 2013) ("DSM-V") In addition to this marked incongruence, "[t]here must also be evidence of distress about this incongruence." *Id.* Hereinafter this Complaint will generally refer to the condition as gender dysphoria even when referring to diagnoses prior to 2013.

19.    Upon receiving this diagnosis in early 2000, it was determined that it was medically necessary for Plaintiff to receive treatment for her condition that would help to bring her body into greater conformity with her gender identity. Toward this end, Plaintiff was prescribed feminizing hormone therapy and injections of a progestin (Depo-Prevera) to accomplish chemical castration. Plaintiff has received these treatments continually from January 2000 through the present, with periodic dose adjustments as necessary.

20.    As a result of Plaintiff's feminizing hormone therapy and chemical castration treatments over the past fourteen years, Plaintiff's physical features and voice have feminized. Plaintiff has been living as a female since the 1990s and her medical records repeatedly describe her as a "biological female" based upon her presentation, her estrogen and testosterone levels and the chemical castration. Her prison records note that she "tend[s] to move and gesture in a feminine manner" and describe her as "a pleasant-looking woman, slender and coiffed in a pony tail" who "walk[s] the yard . . . as a woman."

21.    The end goal of Plaintiff's treatment has always been to bring her primary and secondary sex characteristics into conformity with her female gender identity. The only way this can be accomplished for Plaintiff is through sex reassignment surgery ("SRS"), also known as gender confirming surgery, which involves, *inter alia*, reconstructing the genitalia to conform in appearance and function to that typically associated with the person's gender identity. Plaintiff's records from the 1990s through the present reflect that she considered herself a transsexual, suffered severe distress as a result of her condition and desired to obtain a "sex change." Her medical records consistently reflect that she was "undergoing a sex change" and in the "process" of changing her sex, with the final step of that process being SRS.

22.    In addition to treating the severe mental anguish Plaintiff experiences as a result of her gender dysphoria, SRS also is medically necessary so that Plaintiff may reduce the high

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

dosages of feminizing hormones and Depo-Provera that she receives, which Defendants have repeatedly acknowledged are medically necessary treatment for Plaintiff's gender dysphoria. Large intake of these hormones over the course of many years has been attributed to increased risk for heart and vascular conditions and certain types of cancer.  Eliminating these unnecessary increased risks is particularly essential in Plaintiff's case, because she contracted Hepatitis C after being gang raped while in CDCR custody in 2009 and thus already has significant risk factors and would face significant, heightened risks if she were to develop one of these conditions.  SRS would entirely eliminate the need for Plaintiff to take Depo-Provera and would reduce by approximately 2/3 the required feminizing hormone dosage.

23.    In 2012, Plaintiff's treating psychologist, Dr. Reese, expressly prescribed SRS as medically necessary for Plaintiff, finding that "it is clear that clinical medical necessity suggest and mandate a sex change medical operation before normal mental health can be achieved for this female patient."  Dr. Reese repeatedly renewed his opinion with regard to the necessity of SRS for the following six months, at which time Plaintiff was removed from his care by the CDCR.

## II.    SRS IS WIDELY RECOGNIZED AS MEDICALLY NECESSARY TREATMENT FOR GENDER DYSPHORIA

24.    Dr. Reese's finding that SRS was a medically necessary treatment for Plaintiff's gender dysphoria is supported by leading medical research and standards of care.  Gender dysphoria is recognized as a serious medical condition, with mental and physical manifestations. SRS has widely been accepted as genuine, necessary treatment for severe cases of gender dysphoria, including by the federal courts that have addressed the issue.

25.    Gender dysphoria is not just a mild discomfort with one's sex assigned at birth; rather, it is a profound disturbance such that the lives of some transsexual people revolve only around performing activities to lessen their gender distress.  DSM-V 453-454. Gender dysphoria often comes with severe mental anguish and the inability to function normally at school, at work, or in a relationship.  *Id.* at 457-58.  Moreover, those suffering from gender dysphoria often become socially ostracized and stigmatized, which further diminishes self-esteem.  *Id.*  Although gender dysphoria on its own is not considered a life-threatening illness, when not properly

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

treated, it is often associated with dangerous related conditions such as depression, substance

related disorders, self-mutilation, and suicide. *Id.* at 458-59. Without treatment, the path for

those suffering from gender dysphoria can be torturous, as evidenced by shockingly

high suicide rates: 45 percent for those aged 18-44, in comparison to the national average of 1.6

percent, according to the 2009 National Transgender Discrimination Survey.

26.     The World Professional Association for Transgender Health ("WPATH") is a non-profit, multidisciplinary professional association dedicated to understanding and treating gender dysphoria. The organization seeks to promote evidence-based care, education, research, advocacy, public policy, and respect for transgender health. WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"), which are based upon the best available science and expert professional consensus and articulate clinical guidance for health professionals to assist with safe and effective care that maximizes the patients' overall health and psychological well-being. The current version of the Standards of Care—Version 7—was released in September 2011 following a five-year process in which eighteen gender dysphoria specialists submitted peer-reviewed papers to help identify the most effective treatments for gender dysphoria. Eli Coleman et al., Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, 13 INT'L J. OF TRANGENDERISM, 165 (2011) ("Standards of Care"), attached hereto as Exhibit 1. WPATH's Standards of Care are the prevailing standards for treating gender dysphoria. Mental health providers and medical professionals rely heavily on the Standards of Care in determining the best course of treatment for their patients.

27.     The Standards of Care make clear that SRS is an "essential and medically necessary" treatment for gender dysphoria in certain cases. Hormone therapy alone for those individuals is not sufficient. As the Standards of Care explain:

> While many transsexual, transgender, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria. For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

28.    Under the Standards of Care, the criteria for vaginoplasty (surgical construction of a vagina) in male-to-female transsexuals include "[p]ersistent, well-documented gender dysphoria," "[twelve] continuous months of hormone therapy as appropriate to the patient's gender goals," and "[twelve] continuous months of living in a gender role that is congruent with their gender identity." *Id.* at 60.  The twelve-month requirement that an SRS candidate live in an identity-congruent gender role is "based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery." *Id.*  It is also recommended that patients seeking SRS have regular visits with a mental health professional or other medical professional.

29.    The Standards of Care apply equally to inmates and non-inmates, expressly noting that "[h]ealth care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . .  All elements of assessment and treatment as described in the SOC can be provided to people living in institutions.  Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements." *Id.* at 206-07.

30.    In California, both Medicaid and private health insurance plans offer coverage for health care treatment related to gender transition, including SRS.

31.    Medical studies have shown the effectiveness of SRS as a treatment for gender dysphoria.  Modern SRS has been practiced for more than half a century and is the internationally recognized treatment to treat gender dysphoria in transsexual persons.  A thorough analysis of available research conducted in 1990 concluded that SRS is an effective treatment for gender dysphoria because it drastically reduced the distress of patients with gender dysphoria.  In 2007 a review of multiple studies on SRS was conducted. Special attention was paid to the effects of SRS on gender dysphoria, sexuality, and regret. The researchers concluded that SRS is an effective treatment for gender dysphoria and the only treatment that has been evaluated empirically with large clinical case series.

32.    A 2009 study aimed at evaluating the results of surgical reassignment of genitalia

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

1    in transgender women concluded that surgical conversion of the genitalia is a safe and important

2    phase of the treatment of transgender women.

3        33.    In a study published in 2010 on outcomes of individuals following sex

4    reassignment almost all patients were satisfied with the sex reassignment and 86% were assessed

5    by clinicians at follow-up as stable or improved in global functioning.

6        34.    Another study conducted in 2010 with 247 transgender women indicated surgical

7    treatments are associated with improved mental health-related quality of life.

8        35.    Nearly every study to date has concluded SRS is an effective treatment for gender

9    dysphoria.

10       36.    Research also has confirmed that hormone therapy alone is insufficient to treat

11   certain cases of gender dysphoria.  For example, one study compared gender dysphoria patient

12   groups before treatment, during hormone therapy and after SRS and showed that a bigger

13   improvement occurs after SRS than after simply changing the gender role.

14   **III.    DEFENDANTS DENIED PLAINTIFF MEDICALLY NECESSARY SURGERY**

15       37.    On September 16, 2012, Plaintiff filed a Patient/Inmate Health Care Appeal

16   seeking SRS as a medically necessary treatment for her gender dysphoria, because the extensive

17   feminizing hormone therapy and chemical castration treatments she had received over the course

18   of the prior thirteen years were unsuccessful in reducing the extreme distress Plaintiff suffers as a

19   result of her gender dysphoria.  Plaintiff ultimately was denied SRS at three levels of review,

20   despite the explicit finding by Dr. Reese – Plaintiff's treating mental health care professional –

21   that SRS is medically necessary to treat Plaintiff's gender dysphoria and Plaintiff's well-

22   documented mental anguish – including anxiety and depression – resulting from being forced to

23   retain her male genitalia.

24       38.    The first level of review was performed by Defendant Newton.  Defendant Newton

25   denied Plaintiff's appeal for SRS on or around September 28, 2012 despite Plaintiff's well-

26   documented case of serious gender dysphoria and the resulting mental anguish, including anxiety

27   and depression that only SRS would effectively treat.  Plaintiff's medical records make clear that

28   Plaintiff had been living as a female and receiving feminizing hormone therapy and chemical

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9                    FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

1  castration treatments for over twelve years but still experienced significant distress and anxiety as

2  a result of the discrepancy between her remaining male sex characteristics, including non-

3  functioning male genitalia, and her female gender identity.  In fact, Plaintiff's mental anguish is

4  intensified by the fact – repeatedly established in her medical records – that Plaintiff is a

5  "biological female" based upon her hormone levels and chemical castration, yet is being forced to

6  live every minute of every day in a body with male genitalia that does not match her biology or

7  deeply rooted identity.  It thus was clear under prevailing Standards of Care and medical research

8  that SRS was medically necessary and that Plaintiff fully met the requirements for sex

9  reassignment surgery.

10       39.    Defendant Newton thus was fully aware that Plaintiff faces a serious medical need

11  for SRS in order to treat her diagnosed gender dysphoria but was deliberately indifferent to

12  Plaintiff's medical need for SRS and denied her appeal.  Defendant Newton failed to take any

13  reasonable measures to address the ongoing mental anguish that Plaintiff suffers as a result of her

14  gender dysphoria, which is not fully addressed by the feminizing hormone therapy and chemical

15  castration treatments that Plaintiff has been receiving for the past 14 years.  Defendant Newton's

16  denial of Plaintiff's request for medically necessary SRS was unreasonable and manifested a

17  wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based upon her history

18  documented in her medical records and the prudent professional standards embodied by the

19  WPATH Standards of Care.  Defendant Newton's deliberate indifference is further evidenced by

20  unreasonable reliance upon Newton's own non-specialized conclusions rather than those of a

21  qualified, experienced medical provider.

22       40.    Following Defendant Newton's denial of Plaintiff's request, Plaintiff appealed to

23  the second level of review on October 1, 2012.  In appealing to the second level of review,

24  Plaintiff explained that she "suffers greatly w/out gender reassignment surgery," and indicated

25  that her suffering would be substantially relieved through SRS.  Plaintiff's second level appeal

26  was denied by Defendant Adams on or around November 27, 2012.

27       41.    In the denial, Defendant Adams writes that "[o]ver the past year and a half, neither

28  your mental health [provider] nor your [Primary Care Provider] has recommended SRS as a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

treatment for any of your medical conditions," and while "[Plaintiff's] mental health team is well aware [of her] needs," "[t]hey have not recommended SRS as a treatment which would help any of [Plaintiff's] mental health conditions." Notably, Defendant Adams' denial of the appeal does not state that either Plaintiff's mental health provider or primary care provider opposed SRS or that Defendant Adams ever expressly asked Plaintiff's mental health provider or primary care physician if Plaintiff needed SRS. Moreover, there is no indication that Plaintiff's request for SRS was ever reviewed by a health care provider with sufficient experience or knowledge regarding gender dysphoria.

42.     Instead, Defendant Adams relies only on Adams' own, non-specialized conclusion that SRS is not necessary solely because the medical records purportedly did not explicitly state that SRS was recommended. Had Defendant Adams inquired, Adams would have discovered that Plaintiff's mental health provider did, in fact, recommend SRS as medically necessary treatment for Plaintiff's gender dysphoria. Indeed, only two days later, on November 29, 2012, Dr. Reese—Plaintiff's treating mental health care professional—specifically prescribed SRS as medically necessary to treat Plaintiff's gender dysphoria, writing that "[a]s a female person, and one for the last 13 years, with the diagnoses given and awarded 13 years ago, it is clear that clinical necessity suggest and mandate a sex change medical operation before normal mental health can be achieved for this female patient."

43.     Regardless, even if none of Plaintiff's health care providers explicitly included in their reports a recommendation for SRS, Plaintiff's medical records make clear that Plaintiff had been living as a female and receiving feminizing hormone therapy and chemical castration treatments for over twelve years but still experienced (and continues to experience) significant distress and anxiety as a result of the discrepancy between her remaining male sex characteristics, including non-functioning male genitalia, and her female gender identity and thus that SRS is medically necessary treatment for her. Defendant Adams was fully aware that Plaintiff faces a serious medical need for SRS in order to treat her diagnosed gender dysphoria but was deliberately indifferent to Plaintiff's medical need for SRS when Adams denied Plaintiff's appeal. Defendant Adams failed to take any reasonable measures to address the ongoing mental anguish

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

that Plaintiff suffers as a result of her gender dysphoria, which is not fully addressed by the feminizing hormone therapy and chemical castration treatments that Plaintiff has been receiving for the past 14 years.  Defendant Adams' denial of Plaintiff's request for medically necessary SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based upon her history documented in her medical records and the prudent professional standards embodied by the WPATH Standards of Care.  Defendant Adams' deliberate indifference is further evidenced by unreasonable reliance upon Adams' own non-specialized conclusions rather than those of a qualified, experienced medical provider.

44.     Despite Dr. Reese's clear prescription of SRS as treatment for Plaintiff's gender dysphoria, no official moved to schedule or otherwise provide SRS to Plaintiff.  Plaintiff therefore appealed to the third level of review on December 4, 2012.

45.     In response to Plaintiff's third appeal, Defendant Coffin was assigned to create a report.  Defendant Coffin interviewed Plaintiff for the report on or around July 1, 2013 and he submitted the report on or around October 10, 2013.  Upon information and belief, Defendant Coffin has no significant experience or training in the treatment of transsexual patients and is not qualified to make a determination with regard to the medical necessity of SRS.

46.     In his report, Defendant Coffin reconfirms Plaintiff's diagnosis of gender dysphoria, agreeing that she legitimately suffers as a result of the discrepancy between the gender assigned to her at birth and her own female gender identity and that Plaintiff does not identify as female for any perceived cultural advantage, or to otherwise reap any benefits from a female classification.  Defendant Coffin confirms that Plaintiff had an "extended period of gender identity confusion" which was consolidated in the mid-1990s, and her behavior "appears to confirm the accuracy of [Dr. Carl Viesti's 2000] diagnosis [of gender dysphoria]."  Defendant Coffin also acknowledges that, despite 14 years of feminizing hormone therapy and chemical castration, Plaintiff's gender dysphoria continues to "create distress for [Plaintiff] related to [her] gender identity," including living a "miserable existence" because Plaintiff is "not happy with who [she] is."

47.     Defendant Coffin even acknowledges that Plaintiff likely meets the requirements

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

for SRS, yet self-servingly concludes: "While it appears likely that [Norsworthy's] medical consultants would approve [her] as a candidate for SRS as an *elective* procedure, in the opinion of this evaluator the available documentation does not establish SRS as medically necessary at this time." Defendant Coffin fails to explain why Plaintiff's treating psychotherapist Dr. Reese's findings that SRS is medically necessary should not be followed, other than to state that "the available evidence does not clearly document that the necessary recommendations have been made or approved consistent with Department policy," as "[t]here does not appear to be evidence on the record that the gender and endocrinology specialists involved in [Plaintiff's] care have made a specific recommendation regarding SRS." Thus, rather than making an assessment of what treatment actually is medically necessary for Plaintiff based upon her medical records, his own evaluation of Plaintiff, and standards of care in the field, Defendant Coffin solely bases his recommendation on his self-serving conclusion that "the available evidence" does not explicitly include a recommendation for SRS from "gender and endocrinology specialists."

48.     Notably, similar to Defendant Adams, Defendant Coffin does not state that any gender or endocrinology specialist ever recommended against SRS or that he actually ever even consulted with a gender or endocrinology specialist regarding Plaintiff's treatment. Nor does Defendant Coffin offer any explanation for why the recommendation of a gender or endocrinology specialist is required or why, if required, a gender or endocrinology specialist was not charged with providing the report for the third level of review.

49.     Under these circumstances, it is clear that the rationale for Defendant Coffin's recommendation against SRS was merely a pretext. Plaintiff's medical records make clear that Plaintiff had been living as a female and receiving feminizing hormone therapy and chemical castration treatments for over 13 years but still experienced (and continues to experience) significant distress and anxiety as a result of the discrepancy between her remaining male sex characteristics, including non-functioning male genitalia, and her female gender identity and thus that SRS is medically necessary treatment. Defendant Coffin thus was fully aware that Plaintiff faces a serious medical need for SRS in order to treat her diagnosed gender dysphoria but was deliberately indifferent to Plaintiff's medical need for SRS in recommending against SRS.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

Defendant Coffin failed to take any reasonable measures to address the ongoing mental anguish that Plaintiff suffers as a result of her gender dysphoria, which he acknowledged is not fully addressed by the feminizing hormone therapy and chemical castration treatments that Plaintiff has been receiving for the past 14 years.  Defendant Coffin's denial of Plaintiff's request for medically necessary SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based upon her history documented in her medical records and the prudent professional standards embodied by the WPATH Standards of Care. Defendant Coffin's deliberate indifference is further evidenced by Coffin's unreasonable reliance upon his own non-specialized conclusions rather than those of a qualified, experienced medical provider.

50.     On October 25, 2013, based upon Defendant Coffin's recommendation Plaintiff's third and final appeal was denied by Defendant Zamora, Chief of the CDCR Office of Third Level Appeals-Health Care because "[Plaintiff's] current providers have documented the determination that the subject surgery is not medically necessary for [her]," and Plaintiff's "appeal of that determination does not include a showing that the subject surgery is medically necessary."  Defendant Zamora's decision is wholly unsupported by Plaintiff's medical records. Defendant Zamora failed to address Dr. Reese's opinion that SRS was medically necessary in the denial, failed to obtain the recommendation of any other qualified health care provider, and failed to offer any measures to address Plaintiff's ongoing mental anguish resulting from her gender dysphoria.

51.     Defendant Zamora was fully aware that Plaintiff faces a serious medical need for SRS in order to treat her diagnosed gender dysphoria but was deliberately indifferent to Plaintiff's medical need for SRS in denying her SRS.  Defendant Zamora failed to take any reasonable measures to address the ongoing mental anguish that Plaintiff suffers as a result of her gender dysphoria, which Zamora acknowledged is not fully addressed by the feminizing hormone therapy and chemical castration treatments that Plaintiff has been receiving for the past 14 years. Defendant Zamora's denial of Plaintiff's request for medically necessary SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

upon her history documented in her medical records and the prudent professional standards embodied by the WPATH Standards of Care.  Defendant Zamora's deliberate indifference is further evidenced by Zamora's unreasonable reliance upon the conclusions of non-specialized, inexperienced health care providers rather than those of a qualified, experienced health care professional.

52.     Defendant Zamora's denial exhausted Plaintiff's administrative remedies within the CDCR.

53.     Defendant Beard has ultimate authority for whether or not Plaintiff is provided SRS and for the implementation of CDCR policy with regard to medically necessary medical treatment.  Defendant Beard has endorsed and affirmed the discriminatory and deliberately indifferent conduct of Defendants Newton, Adams, Coffin and Zamora by failing to intercede and grant Plaintiff medically necessary SRS and by failing to ensure that CDCR's policies surrounding the provision of medical treatment are implemented in a fair and non-discriminatory manner and/or that inmates receive medically necessary treatment for gender dysphoria, including SRS in appropriate cases.  Defendant Beard's deliberate indifference is further evidenced by Beard's unreasonable reliance upon the conclusions of non-specialized, inexperienced health care providers rather than those of a qualified, experienced health care professional.

## IV.  CALIFORNIA CODE OF REGULATIONS TITLE 15, SECTION 3350.1 IS DISCRIMINATORY AND DOES NOT IMMUNIZE DEFENDANTS' UNCONSTITUTIONAL DENIAL OF SRS

54.     Defendants' refusal to provide SRS to Plaintiff is not justified by California Code of Regulations ("C.C.R.") Title 15, Section 3350.1, which identifies vaginoplasty as a "[s]urgery not medically necessary [that] shall not be provided" except for cystocele or rectocele (conditions involving damages to the vaginal wall) unless the patient's attending physician prescribes the treatment and "[t]he service is approved by the medical authorization review committee and the health care review committee."  15 C.C.R. § 3350.1(b)(2); 15 C.C.R. § 3350.1(d).

55.     As a preliminary matter, this regulatory scheme is facially discriminatory against transsexual women inmates by making vaginoplasty *de facto* unavailable for such inmates but

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

allowing the treatment for non-transgender female inmates with certain conditions such as cystocele. The regulation singles out inmates assigned male at birth, and transgender women inmates in particular, by placing onerous, significant barriers to obtaining vaginoplasty even when, as here, it is medically necessary.

56.    Moreover, the regulation was applied by each of the Defendants in a manner that discriminated against Plaintiff on the basis of her status as an inmate assigned male at birth, and a transsexual woman in particular. Each of the Defendants failed to give proper consideration to whether or not SRS was a medical necessity for the treatment of Plaintiff's gender dysphoria and based their conclusions on different factors and processes than they would have in determining the appeal of a non-transgender inmate's request for medically-necessary surgery. Each Defendant regarded and applied the regulation as a *de facto* bar to Plaintiff's request for SRS – and vaginoplasty in particular – solely as the result of Plaintiff being assigned male at birth, and status as a transgender woman in particular.

57.    Finally, each of the Defendants discriminated against Plaintiff and manifested deliberate indifference to the mental anguish and suffering still resulting from her gender dysphoria by failing to prescribe SRS and refer Plaintiff's SRS for approval by the medical authorization review committee and the health care review committee pursuant to 15 C.C.R. § 3350.1(d).

58.    Plaintiff continues to suffer deep anxiety and distress as a result of the discrepancy between her female gender identity and her remaining male sex characteristics, including non-functioning male genitalia. Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records – that Plaintiff is a biological female based upon her hormone levels and chemical castration, yet is being forced to live every minute of every day in a body with male genitalia that does not match her biology.

## V.    PLAINTIFF'S REQUEST FOR A NAME CHANGE

59.    Plaintiff identifies and has been living as a woman since the 1990s. As part of her treatment for gender dysphoria and to militate against the effects caused by the discrepancy between Plaintiff's female gender identity and the male sex assigned to her at birth, Plaintiff

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

changed her name from the normatively masculine Jeffrey Bryan Norsworthy, to the normatively feminine name Michelle-Lael Bryanna Norsworthy.  Plaintiff has been using the name "Michelle" – in all settings in which she had the ability to do so – since the mid-1990s.

60.     Use of the name "Jeffrey" is a painful reminder to Plaintiff of the discrepancy between Plaintiff's female gender identity and the male sex assigned to her at birth and causes Plaintiff severe distress and anxiety each time it is used.  WPATH's Standards of Care recognize "changes in name and gender markers on identity documents" as an important part of the treatment for gender dysphoria.  Standards of Care at 171-72.  In a statement issued by the WPATH Board of Directors in 2008, they made it clear that SRS "is not required for social gender recognition, and such surgery should not be a prerequisite for document or record changes."   Instead, "[c]hanges to documentation are important aids to social functioning, and are a necessary component of the pre-surgical process; delay of document changes may have a deleterious impact on a patient's social integration and personal safety."

61.     Consistent with the Standards of Care, Plaintiff's treating doctors generally refer to her as "Michelle" not "Jeffrey."

62.     With very few exceptions, California law permits any person to obtain a change of name from a California Superior Court.  Cal. Code Civ. Proc. §§ 1275, 1279.5.  For a transgender person seeking a change of name to better conform the name to the person's gender identity, the law provides that a name change petition must be granted without the necessity of a hearing if no opposition is raised.

63.     Persons under the supervision of CDCR, however, are required to obtain the permission of the warden of the facility in which he or she is housed in order to submit documentation to the Superior Court for approval of a requested name change. Cal. Code Civ. Proc. § 1279.5.

64.     In furtherance of her treatment for gender dysphoria and to minimize the use of the name "Jeffrey" and the pain and distress associated therewith, Plaintiff submitted a request for approval for a legal name change to the warden of the CDCR facility to which she was assigned at the time – Defendant Spearman of the Correctional Training Facility.  However, her request for

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

1   a name change was denied.

2       65.    The formal appeal at the first level was bypassed by the appeals coordinator and

3   Plaintiff's appeal was accepted at the second level of review.  Defendant Spearman denied the

4   appeal, however, because although Spearman "acknowledge[d] the appellant is in the process of

5   'trans-sexualism'" he determined "that it would not be appropriate to approve a name change to

6   the feminine until the appellant is determined to meet the criteria to be assigned to an institution

7   for female offenders."  Defendant Spearman presented no justification or reasoning for this

8   position.

9       66.    Defendant Spearman's decision explicitly discriminates against Plaintiff on the

10  basis of her gender – refusing to allow Plaintiff a feminine name because Plaintiff was assigned

11  the male sex at birth and has not yet been provided medically necessary SRS treatment.

12  Defendant Spearman's decision further discriminated against Plaintiff because she is a

13  transsexual woman, treating Plaintiff's request differently and subjecting it to different criteria

14  than he would the name change request of an inmate who was not transgender.

15      67.    In addition to being discriminatory, Defendant Spearman's denial of Plaintiff's

16  request to pursue a legal name change was deliberately indifferent to Plaintiff's gender dysphoria

17  and the mental anguish and suffering caused by not being able to legally change her name.

18  Defendant Spearman was fully aware that Plaintiff suffers from gender dysphoria, even

19  acknowledging her condition in the decision, but failed to take any reasonable measures to

20  address the ongoing mental anguish that Plaintiff unnecessarily suffers as a result of not being

21  able to change her name or to offer any legitimate justification for refusing to allow her to pursue

22  a legal name change.

23      68.    Plaintiff appealed to the third level of review, where the appeals examiners,

24  Defendants Van Leer and Lozano, found the Warden's denial of Plaintiff's name change request

25  "appropriate as the appellant is still incarcerated in an institution for men."

26      69.    The decision of Defendants Van Leer and Lozano to deny Plaintiff access to

27  pursue a name change – just like that of Defendant Spearman – clearly discriminates against

28  Plaintiff by treating Plaintiff's request differently than those of other inmates solely on the basis

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

of Plaintiff's gender and gender dysphoria.  In addition to being discriminatory, Defendants Van

Leer and Lozano were deliberately indifferent to Plaintiff's gender dysphoria and the mental

anguish and suffering caused by not being able to legally change her name.

70.    The final denial by Defendants Van Leer and Lozano exhausted Plaintiff's

administrative remedies available to her within the CDCR.  Because Plaintiff is incarcerated, she

is unable to petition the California Superior Court for a name change without first obtaining

approval from the Warden and ultimately Defendant Beard, the Secretary of the CDCR.  Cal.

Code Civ. Proc. § 1279.5.

71.    Defendant Beard thus has ultimate authority for whether or not Plaintiff is allowed

to pursue a legal name change and for the implementation of CDCR policy with regard to inmate

name changes.  Defendant Beard has endorsed and affirmed the discriminatory and deliberately

indifferent conduct of Defendants Spearman, Van Leer and Lozano by failing to intercede and

grant Plaintiff's request to pursue a legal name change and by failing to ensure that the name

change policy is implemented in a fair and non-discriminatory manner and/or that inmates receive

medically necessary treatment for gender dysphoria, including the ability to change one's legal

name.

72.    Plaintiff seeks permission for a legal name change as a further step toward

minimizing the discrepancy between her gender identity and the sex she was assigned at birth and

as a fundamental aspect of expression of her true, female identity.  As a transsexual woman,

Plaintiff suffers severe emotional and psychological stress and anxiety when she is referred to by

the normatively masculine name given to her at birth.

73.    This distress can be alleviated by a simple name change that will aid in the

treatment of Plaintiff's gender dysphoria and allow Plaintiff to express herself authentically in

accordance with her female gender identity.  The repeated refusal to provide Plaintiff with this

treatment for gender dysphoria serves no government objective, and there is no rational basis

under which to deny her requested name change. The only explanation offered (that Plaintiff does

not qualify for placement in a women's facility) is wholly unsupported by the medical literature

regarding the treatment of gender dysphoria and clearly discriminates against Plaintiff based upon

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

1    her gender and gender dysphoria.

2    **COUNT ONE**

3    VIOLATION OF 42 U.S.C. § 1983 BASED UPON
     DEPRIVATION OF EIGHTH AMENDMENT RIGHTS RESULTING FROM
4    FAILURE TO PROVIDE MEDICALLY NECESSARY SURGERY

5    (against Defendants Beard, Newton, Adams, Zamora, and Coffin)

6        74.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 73 as if fully

7    set forth herein.

8        75.    Plaintiff has been diagnosed with the serious medical condition of gender

9    dysphoria which, despite 14 years of feminizing hormone therapy and chemical castration,

10   continues to cause Plaintiff serious mental distress, and requires treatment in the form of SRS as

11   prescribed by Plaintiff's former treating mental health provider, Dr. Reese, and supported by

12   prevailing medical standards of care.

13       76.    Each Defendant – acting in his/her official capacity and under color of state law –

14   was and remains deliberately indifferent to Plaintiff's medical need for SRS.  Each Defendant

15   knew of Plaintiff's serious medical need for SRS and disregarded Plaintiff's need and failed to

16   take any reasonable measures to address Plaintiff's continued pain and suffering resulting from

17   her gender dysphoria.  The deliberate indifference of each Defendant is further demonstrated by

18   that Defendant's unreasonable reliance on their own conclusions or those of other non-specialized

19   individuals rather than the conclusions and recommendations of a health care professional with

20   sufficient training and/or experience in the treatment of gender dysphoria.

21       77.    Defendants' continued denial of SRS is causing irreparable harm to Plaintiff,

22   including severe anxiety and distress as a result of the discrepancy between her remaining male

23   sex characteristics, including non-functioning male genitalia, and her female gender identity.

24   Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records

25   – that Plaintiff is a "biological female" based upon her hormone levels and chemical castration,

26   yet is being forced to live every minute of every day in a body with male genitalia that does not

27   match her biology.  The denial of SRS also unreasonably and recklessly places Plaintiff at

28   increased risk for heart and vascular conditions and certain types of cancer, particularly given that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

1    she is afflicted with Hepatitis C, which risks could be substantially reduced as a result of the

2    substantially reduced hormone treatments that would be required following SRS.

3        78.    By failing to provide SRS to Plaintiff while incarcerated, Defendants have

4    deprived Plaintiff of her right to medically necessary treatment guaranteed by the Eighth

5    Amendment to the United States Constitution.

6                              **COUNT TWO**

7    VIOLATION OF 42 U.S.C. § 1983 BASED UPON DEPRIVATION OF FOURTEENTH
     AMENDMENT RIGHT TO EQUAL PROTECTION BY REFUSING PLAINTIFF SRS ON
8              THE BASIS OF GENDER AND TRANSGENDER STATUS

9            (against Defendants Beard, Newton, Adams, Zamora, and Coffin)

10       79.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 78 as if fully

11   set forth herein.

12       80.    California Code of Regulations ("C.C.R.") Title 15, Section 3350.1 identifies

13   vaginoplasty as a "[s]urgery not medically necessary [that] shall not be provided" except for

14   cystocele or rectocele unless the patient's attending physician prescribes the treatment and "[t]he

15   service is approved by the medical authorization review committee and the health care review

16   committee."  15 C.C.R. § 3350.1(b)(2); 15 C.C.R. § 3350.1(d).

17       81.    This regulatory scheme discriminates against transsexual women inmates by

18   making vaginoplasty *de facto* unavailable for such inmates but allowing the treatment for non-

19   transgender female inmates with certain conditions such as cystocele.  The statute singles out

20   inmates assigned male at birth, and transgender women inmates in particular, by placing onerous,

21   significant barriers to obtaining vaginoplasty even when, as here, it is medically necessary.

22       82.    Each of the Defendants applied the statute in a manner that discriminated against

23   Plaintiff on the basis of her gender and transgender status.  In considering Plaintiff's need for

24   SRS, each Defendant failed to give proper consideration to the specific circumstances of

25   Plaintiff's gender dysphoria and need for SRS but instead based their conclusions on factors and

26   processes that they would not have considered in determining the medical necessity of a treatment

27   for a non-transgender inmate's request for medically-necessary surgery.  Each Defendant

28   regarded and applied the statute as a *de facto* bar to Plaintiff's request for SRS – and vaginoplasty

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

1    in particular – solely as the result of Plaintiff being assigned male at birth, and a transsexual

2    woman in particular.

3        83.    Finally, each Defendant discriminated against Plaintiff and manifested deliberate

4    indifference to the mental anguish and suffering still resulting from her gender dysphoria by

5    failing to prescribe SRS and refer Plaintiff's SRS for approval by the medical authorization

6    review committee and the health care review committee pursuant to 15 C.C.R. § 3350.1(d)

7        84.    Defendants intentionally treat Plaintiff differently from non-transgender female

8    inmates seeking vaginoplasty due to her gender and transgender status.

9        85.    Due to the difference in treatment, similarly situated non-transgender women with

10   serious medical needs are able to receive adequate medical care, including medically necessary

11   vaginoplasty, but inmates assigned male at birth and transgender inmates requiring such treatment

12   are either barred from receiving it or, at a minimum, held to a more onerous standard.

13       86.    The difference in treatment between transgender women and non-transgender

14   women does not further any important government interest in a way that is substantially related to

15   that interest, nor is it rationally related to any legitimate government interest.

16       87.    Defendants' discriminatory denial of SRS is causing irreparable harm to Plaintiff,

17   including severe anxiety and distress as a result of the discrepancy between her remaining male

18   sex characteristics, including non-functioning male genitalia, and her female gender identity.

19   Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records

20   – that Plaintiff is a "biological female" based upon her hormone levels and chemical castration,

21   yet is being forced to live every minute of every day in a body with male genitalia that does not

22   match her biology.  The denial of SRS also unreasonably and recklessly places Plaintiff at

23   increased risk for heart and vascular conditions and certain types of cancer, particularly given that

24   she is afflicted with Hepatitis C, which risks could be substantially reduced as a result of the

25   substantially reduced hormone treatments that would be required following SRS.

26       88.    By failing to provide SRS to Plaintiff while incarcerated, Defendants have

27   deprived Plaintiff of her right to equal protection under the laws guaranteed by the Fourteenth

28   Amendment to the United States Constitution.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

## **COUNT THREE**

VIOLATION OF 42 U.S.C. § 1983 BASED UPON
DEPRIVATION OF EIGHTH AMENDMENT RIGHTS RESULTING FROM
FAILURE TO ALLOW PLAINTIFF LEGAL NAME CHANGE

(against Defendants Beard, Spearman, Van Leer and Lozano)

89.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 88 as if fully set forth herein.

90.     Plaintiff has been diagnosed with the serious medical condition of gender dysphoria and the continued use of Plaintiff's normatively masculine legal name causes Plaintiff serious mental distress that would be significantly reduced by allowing Plaintiff to change her legal name to her preferred normatively feminine name, Michelle-Lael Bryanna Norsworthy.

91.     Each Defendant – acting in his/her official capacity and under color of state law – was and remains deliberately indifferent to Plaintiff's medical need for a legal name change, in spite of Plaintiff's well-documented condition and widely recognized Standards of Care recognizing the need for a name change.  Each Defendant knew of Plaintiff's serious medical need for the name change and deliberately disregarded Plaintiff's need and failed to take any reasonable measures to address Plaintiff's continued pain and suffering resulting from her inability to legally change her name.  The deliberate indifference of each Defendant is further demonstrated by that Defendant's unreasonable reliance on their own conclusions or those of other non-specialized individuals rather than the conclusions and recommendations of a health care professional with sufficient training and/or experience in the treatment of gender dysphoria.

92.     Defendants' continued denial of the request to pursue a legal name change is causing irreparable harm to Plaintiff, including severe anxiety and distress.

93.     By failing to provide permission for Plaintiff to petition the California Superior Court for a name change while incarcerated, Defendants have deprived Plaintiff of her right to medically necessary treatment guaranteed by the Eighth Amendment to the United States Constitution.

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

23

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

1

## COUNT FOUR

2

VIOLATION OF 42 U.S.C. § 1983 BASED UPON DEPRIVATION OF FOURTEENTH
AMENDMENT RIGHT TO EQUAL PROTECTION BY REFUSING PLAINTIFF

3

PERMISSION TO PURSUE A LEGAL NAME CHANGE ON THE BASIS OF GENDER AND
TRANSGENDER STATUS

4

(against Defendants Beard, Spearman, Van Leer and Lozano)

5

6      94.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 93 as if fully

7  set forth herein.

8      95.     California Code of Regulations, Title 15, section 3294.5 explicitly allows inmates

9  to request legal name changes.

10     96.     Each Defendant – acting in his/her official capacity and under color of state law –

11  discriminated against Plaintiff by refusing to permit her to seek a legal name change as a result of

12  her gender and transgender status.  In particular, each Defendant refused Plaintiff's request to

13  change her name to a normatively feminine name solely because Plaintiff was assigned male at

14  birth.  Upon information and belief, similarly situated non-transgender female inmates are

15  permitted to change their names to normatively feminine names and similarly situated non-

16  transgender male inmates are permitted to change their names to desired normatively masculine

17  names.

18     97.     This difference in treatment with regard to name changes based upon gender and

19  transgender status does not further any important government interest in a way that is

20  substantially related to that interest, nor is it rationally related to any legitimate government

21  interest.

22     98.     Defendants' discriminatory denial of Plaintiff's request to petition the California

23  Superior Court for a name change is causing irreparable harm to Plaintiff, including severe

24  anxiety and distress.

25     99.     By failing to provide permission for Plaintiff to petition the California Superior

26  Court for a name change while incarcerated, Defendants have deprived Plaintiff of her right to

27  equal protection under the laws guaranteed by the Fourteenth Amendment to the United States

28  Constitution.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants Beard, Newton, Adams, Zamora, Coffin, Spearman, Van Leer and Lozano, and Does 1-30 as follows:

100.    Enter injunctive relief enjoining Defendants from interfering with the discretion of the mental health and other medical professionals involved in Plaintiff's care;

101.    Enter injunctive relief declaring California Code of Regulations, Title 15, Section 3350.1(b)(2) unconstitutional on its face and as applied;

102.    Enter injunctive relief enjoining Defendants to provide Plaintiff with adequate medical care, including SRS;

103.    Enter injunctive relief requiring Defendants to allow Plaintiff to seek a legal name change in the Superior Court of California pursuant to California Code of Regulations, Title 15, section 3294.5; California Code of Civil Procedure sections 1279.5, 1276 and 1277;

104.    Award reasonable attorneys fees and costs to Plaintiff pursuant to 42 U.S.C. § 1988; and

105.    Such other relief as the Court finds appropriate in the interests of justice.


Dated: July 2, 2014                                    MORGAN, LEWIS & BOCKIUS LLP


                                                       By ____/s/ - Herman J. Hoying____
                                                          HERMAN J. HOYING
                                                          MORGAN, LEWIS & BOCKIUS LLP
                                                          One Market, Spear Street Tower
                                                          San Francisco, California  94105-1126
                                                          Telephone:      415.442.1000
                                                          Facsimile:       415.442.1001
                                                          hhoying@morganlewis.com


                                                          Attorneys for Plaintiff

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST