1  KAMALA D. HARRIS
   Attorney General of California
2  JAY C. RUSSELL
   Supervising Deputy Attorney General
3  JOSE ZELIDON-ZEPEDA
   Deputy Attorney General
4  PREETI K. BAJWA
   Deputy Attorney General
5  State Bar No. 232484
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 703-5781
7    Fax:  (415) 703-5843
     E-mail:  Preeti.Bajwa@doj.ca.gov
8  *Attorneys for Defendants J. Beard, M. Spearman,*
   *R. Coffin, J. Lozano, A. Adams, A. Newton, D. Van*
9  *Leer, and L. Zamora*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14  | | |
    |---|---|
15  **MICHELLE-LAEL NORSWORTHY,**          C 14-00695 JST (PR)

16                          Plaintiff,

17       v.                               **DEFENDANTS' OPPOSITION TO**
                                          **PLAINTIFF'S MOTION FOR A**
18  **JEFFREY BEARD, et al.,**            **PRELIMINARY INJUNCTION**

19                          Defendants.   Date:         April 1, 2015
                                          Time:         2:00 p.m.
20                                        Dept:         Courtroom 9
                                          Judge:        The Honorable Jon S. Tigar
21                                        Trial Date:   N/A
                                          Action Filed: 2/14/2014

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

Introduction ................................................................................................................ 1

Legal Standard ........................................................................................................... 1

Statement of Facts ...................................................................................................... 2

I.    Norsworthy has received treatment for her gender dysphoria in prison since 1999 .................................................................................................................. 2

II.    Norsworthy submitted an inmate grievance for sex reassignment surgery in 2012 .................................................................................................................. 4

III.    The federal court-appointed receiver approved regulations directing the availability of medical services on the basis of medical necessity. ...................... 6

IV.    Defendants' expert consultant has determined that sex reassignment surgery is not medically necessary at this time. ....................................................... 7

    A.    Dr. Levine agrees with Dr. Coffin's assessment regarding Norsworthy's readiness for sex reassignment surgery. ............................. 8

    B.    Dr. Levine's examination confirmed that sex reassignment surgery is not immediately medically necessary. ................................................ 8

V.    Providing sex reassignment surgery will pose new and complex safety issues. ............................................................................................................. 10

Argument ................................................................................................................. 11

I.    Under the stringent mandatory injunction standard, injunctive relief is not necessary. ........................................................................................................ 11

II.    The law and facts do not clearly favor injunctive relief under the Eighth Amendment. .................................................................................................... 12

    A.    Norsworthy has not been deprived of constitutionally adequate care ....... 13

    B.    Norsworthy has not clearly established that immediate sex reassignment surgery is medically necessary. ......................................... 14

    C.    Norsworthy's difference of opinion regarding her treatment does not demonstrate a likelihood of success on the merits. ........................... 17

    D.    The constitution does not require that Norsworthy be referred to a "transgender specialist." .......................................................................... 18

III.    Norsworthy is not likely to succeed on her equal protection claim, which in any event would not entitle her to an order directing CDCR to provide surgery that is not medically necessary ............................................................. 20

    A.    The governing regulation does not discriminate against transgender individuals. ............................................................................................ 20

    B.    Decisions relating to prison administration are subject to deferential scrutiny under *Turner v. Safley*. ............................................................. 22

    C.    Immediate surgery would not be the remedy even if Norsworthy prevailed on her equal protection claim. ................................................. 24

IV.    Norsworthy cannot establish irreparable injury requiring an immediate injunction. ....................................................................................................... 25

i

**TABLE OF CONTENTS**
(continued)

Page

V.     The public interest does not favor an order directing prison officials to
       provide treatment that is not medically necessary. ................................ 27

VI.    Norsworthy has not shown that her requested relief meets the PLRA's
       stringent need-narrowness-intrusiveness test. ..................................... 29

Conclusion ............................................................................................... 30

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Acierno v. New Castle County*
    40 F.3d 645 (3d Cir. 1994)................................................................................11

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011).............................................................................1

*Ariz. Dream Act Coal. v. Brewer*
    757 F.3d 1053 (9th Cir. 2014)...........................................................................11

*Broughton v. Cutter Labs.*
    622 F.2d 458 (9th Cir. 1980).............................................................................12

*Caribbean Marine Svcs. Co., Inc. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988).............................................................................14

*Chalk v. United States District Court*
    840 F.2d 701 (9th Cir. 1988).............................................................................26

*Citizens United v. Gessler*
    773 F.3d 200 (10th Cir. 2014)...........................................................................11

*Coleman v. Brown*
    No. 2:90-cv-00520 ......................................................................................10, 28

*Dahl v. HEM Pharm. Corp.*
    7 F.3d 1399 (9th Cir. 1993)...........................................................................1, 26

*De'Lonta v. Clarke*
    11-cv-00257 (W.D. Va.) ................................................................................7, 8

*Dean v. Coughlin*
    804 F.2d 207, 215 (2nd Cir. 1986) ..................................................................17

*Dymo Indus., Inc. v. Tapeprinter, Inc.*
    326 F.2d 141 (9th Cir. 1964)...............................................................................1

*Edie v. Sarasota County*
    908 F.2d 716 (11th Cir. 1990)...........................................................................24

*Estelle v. Gamble*
    429 U.S. 97 (1976) ......................................................................................12, 19

*Farmer v. Brennan*
    511 U.S. 825 (1994).........................................................................................12

iii

# TABLE OF AUTHORITIES
### (continued)

Page

*Ferring Pharm., Inc. v. Watson*
765 F.3d 205 (3d Cir. 2014)........................................................................11

*Finwall v. City of Chicago*
239 F.R.D. 494 (N.D. Ill. 2006)..................................................................15

*Forbes v. Edgar*
112 F.3d 262 (7th Cir. 1997)........................................................................14

*Forest Guardians v. Animal & Plant Health Inspection Serv.*
309 F.3d 1141 (9th Cir. 2002)......................................................................21

*G.B. v. Lackner*
80 Cal. App. 3d 64 (Cal. Ct. App.) ..............................................................21

*Gilmore v. California*
220 F.3d 987 (9th Cir. 2000).................................................................2, 29

*Handberry v. Thompson*
436 F.3d 52 (2d Cir. 2006)...........................................................................25

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*
882 F.2d 797 (3d Cir. 1989).........................................................................12

*Jackson v. Fair*
846 F.2d 811 (1st Cir. 1988) ........................................................................14

*Jackson v. Kotter*
541 F.3d 688 (7th Cir. 2008)........................................................................19

*Jamison v. Davue*
2012 WL 996383 (E.D. Cal. Mar. 21, 2012) ..............................................23

*Jett v. Penner*
439 F.3d 1091 (9th Cir. 2006).......................................................................12

*Johnson v. California*
543 U.S. 499 (2005) ...............................................................................22, 23

*Jones v. N.C. Prisoners' Labor Union*
433 U.S. 199 (1977) .....................................................................................28

*Kelly v. Merrill*
No. 14-cv-2322, 2014 WL 7740025 (M.D. Pa. Dec. 11, 2014).................28

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Kosilek v. Spencer*
   774 F.3d 63 (1st Cir. 2014) ........................................................................... *passim*

*Kosilek v. Spencer*
   889 F. Supp. 2d 190 (D. Mass. 2012) ........................................................................7

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*
   571 F.3d 873 (9th Cir. 2009)..........................................................................1, 11, 17

*Meriwether v. Faulkner*
   821 F.2d 408 (7th Cir. 1987) ..............................................................................13

*Miller v. French*
   530 U.S. 327 (2000) ...............................................................................................29

*Morrison v. Hall*
   261 F.3d 896 (9th Cir. 2001) ................................................................................23

*Murray v. U.S.B.O.P.*
   106 F.3d 401 (6th Cir. 1997) ................................................................................13

*Nelson v. Campbell*
   541 U.S. 637 (2004) .................................................................................................2

*Plata v. Schwarzenegger*
   603 F.3d 1088 (9th Cir. 2010) .................................................................................6

*Plata v. Schwarzenegger*
   No. C01-1351-TEH (N.D. Cal.) ....................................................................6, 7, 20

*Roberts v. Spalding*
   783 F.2d 867 (9th Cir. 1986) ................................................................................19

*Sanchez v. Vild*
   891 F.2d 240 (9th Cir. 1989) ..........................................................................17, 19

*Servin-Espinoza v. Ashcroft*
   309 F.3d 1193 (9th Cir. 2002) ..............................................................................24

*Soneeya v. Spencer*
   No. 07-12325-JLT (D. Mass.) ..................................................................................7

*Stanley v. Univ. of Southern Cal.*
   13 F.3d 1313 (9th Cir. 1994)...........................................................................1, 11, 17

v

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Toguchi v. Chung*
  391 F.3d 1051 (9th Cir. 2004)...........................................................................................12, 17

*Turner v. Safley*
  482 U.S. 78 (1987) ......................................................................................................22, 23, 24

*U.S. Dep't of Agriculture v. Moreno*
  413 U.S. 528 (1973) .................................................................................................................23

*Univ. of Tex. v. Camenisch*
  451 U.S. 390 (1981) .................................................................................................................27

*Western Radio Serv. Co., v. Espy*
  79 F.3d 896 (9th Cir. 1996)......................................................................................................21

*Wilson v. Seiter*
  501 U.S. 294 (1991) .................................................................................................................12

*Winter v. Natural Res. Def. Council, Inc.*
  555 U.S. 7 (2008).......................................................................................................................1

*Wood v. Housewright*
  900 F.2d 1332 (9th Cir. 1990)..................................................................................................12

*Wylie v. Montana Women's Prison*
  2014 WL 6685983 (D. Mont. Nov. 25, 2014) .........................................................................28

*Zepeda v. INS*
  753 F.2d 719 (9th Cir. 1983)...............................................................................................25, 26

**STATUTES**

18 U.S.C.
  § 3626........................................................................................................................................29
  § 3626(a)(1)(A) ..........................................................................................................................2
  § 3626(a)(2)...........................................................................................................................2, 29

California Penal Code § 148.1 ......................................................................................................28

Immigration and Nationality Act § 212(c)....................................................................................24

Prison Litigation Reform Act ........................................................................................................29

**TABLE OF AUTHORITIES**
(continued)

**Page**

California Code of Regulations, Title 15
§ 3350.1 .......................................................................................... *passim*
§ 3350.1(b) .............................................................................................6
§ 3350.1(d) ...............................................................................6, 20, 22

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Fourth Amendment ..............................................................................25
Eighth Amendment .......................................................................... *passim*

**COURT RULES**

Federal Rules of Civil Procedure
Rule 26(a)(2)(B)(i) ..............................................................................15
Rule 35 ..............................................................................................8, 9

Federal Rule of Evidence 201(b) ......................................................................6

**OTHER AUTHORITIES**

Aetna Clinical Policy Bulletin: Gender Reassignment Surgery, *available at*
www.aetna.com/cpb/medical/data/600_699/0615.html (last visited Mar. 3,
2015) ...................................................................................................21

Center for Medicare and Medicaid Services, Publ. No. 100-03, Manual Medicare
National Coverage Determinations Transmittal 169, *available at*
https://www.cms.gov/Regulations-and-
Guidance/Gudiance/Transmittals/Downloads/R169NCD.pdf (last visited Mar.
3, 2015) ...............................................................................................21

Coffin Rep. ECF No. 66-1 ..................................................................3, 5, 27

Department Operations Manual
§ 12010.6...............................................................................................21
§ 91020.26..............................................................................................21

HealthNet National Medical Policy, Gender Reassignment Surgery, *available at*
https://www.healthnet.com/portal/provider/content/iwc/provider/unprotected/w
orking_with_HN/content/medical_policies.action (last visited Mar. 6, 2015) .....................21

Nichols, David H. and Clarke-Pearson, Daniel L., Gynecologic, Obstetric &
Related Surgery (2d ed. 2000) ..............................................................21

Order, ECF 5131 ..................................................................................10

# TABLE OF AUTHORITIES
### (continued)

**Page**

Vol. 5, Lawyers Medical Encyclopedia, § 36.14(b) .......................................................................21

viii

**INTRODUCTION**

After having received continuous and effective medical and mental health treatment for over fifteen years to address her gender dysphoria, Plaintiff Michelle Norsworthy now seeks the extraordinary remedy of a preliminary injunction ordering state doctors to perform immediate sex reassignment surgery.  But Norsworthy has not demonstrated a medical necessity for such surgery, much less any sudden or dramatic deterioration in her medical or mental health that might otherwise warrant such an order.  Instead, she seeks a "preliminary" injunction that would alter the status quo, not preserve it, while she pursues her legal claims.  Indeed, an order requiring that such surgery be performed immediately would effectively moot the remainder of her case by irreversibly providing her with the entire relief that she seeks.  There is no basis for granting a mandatory preliminary injunction here—particularly where the record has not been sufficiently developed to address complex factual and medical questions as well as reasonable safety concerns by prison administrators that would arise from such an order.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (per curiam).  In seeking one, Norsworthy must demonstrate that she is likely to succeed on the merits of her claims, that she is likely to suffer irreparable harm without preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest.  *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Moreover, a *mandatory* preliminary injunction of the sort sought here "goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citation and brackets omitted).  "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party,'" *Stanley v. Univ. of Southern Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994), and "unless extreme or very serious damage will result," *Marlyn*, 571 F.3d at 879.  *See also Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) ("'mandatory preliminary relief' is

1

subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party").

Finally, because this is a prisoner conditions case, the Prison Litigation Reform Act's standards for injunctive relief apply.  18 U.S.C. § 3626(a)(1)(A).  Under the PLRA, "no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Gilmore v. California*, 220 F.3d 987, 999 (9th Cir. 2000).  Courts must respect principles of comity and "give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the preliminary relief."  18 U.S.C. § 3626(a)(2); *Nelson v. Campbell*, 541 U.S. 637, 650 (2004).

## STATEMENT OF FACTS[1]

### I.   NORSWORTHY HAS RECEIVED TREATMENT FOR HER GENDER DYSPHORIA IN PRISON SINCE 1999.

Norsworthy has been incarcerated in state prison since 1987.  (First Amended Complaint (FAC) ¶ 2, ECF No. 10.)  In 1999, prison officials referred Norsworthy to Dr. Carl Viesti, a psychologist, for assessment of issues relating to her gender identity.  (FAC ¶ 18.)  Per the Diagnostic and Statistical Manual IV (DSM-IV, in effect at the time), Dr. Viesti diagnosed Norsworthy with the condition of Gender Identity Disorder.  (*Id.*)  According to Norsworthy, Dr. Viesti and Dr. Lori Kohler recommended therapy and medication, which Norsworthy sought and received from prison authorities.  (Bajwa Decl. ¶ 5, Ex. D, Pl.'s Dep. 22:9-23:8.)  This included hormone treatment and mental health treatment.  (*Id.*, FAC ¶ 2, ECF No. 10.)  Dr. Kohler oversaw Norsworthy's hormone treatment for some years, but, because of Norsworthy's transfer between prisons, stopped seeing her around 2011.  (Bajwa Decl. ¶ 6, Ex. E, Kohler Dep. 127:8-21.)  Dr. Kohler did not specifically discuss sex reassignment surgery with Norsworthy.  (*Id.* at 129:19-21.)  And Norsworthy never requested a referral for sex reassignment surgery from Dr. Kohler.  (*Id.* at 129:16-18.)

---

[1] To the extent these facts are derived from Norsworthy's First Amended Complaint, Defendants set them forth solely for purposes of this motion, without conceding their accuracy or veracity.

2

Norsworthy has been receiving hormone therapy for her gender dysphoria since 2000, and continues to receive hormone therapy and other forms of treatment.  (Pl.'s Mot. ECF No. 62 at 11.)[2]  Since June 2014, her hormone treatment has been supervised by Dr. Munir.  (Decl. Dr. I. Munir Opp. Pl.'s Mot. Prelim. Inj. (Munir Decl.) ¶¶ 1-2.)  Dr. Munir has readjusted Norsworthy's hormone prescriptions so that they safely provide the appropriate therapeutic benefit to Norsworthy, and  he continues to monitor and adjust her hormone therapy as necessary.  (*Id.* ¶ 4-5.)  Prison officials have also afforded Norsworthy other treatment, including access to brassieres and the chance to grow her hair long.  (Pl.'s Dep. 25:11-18.)  The hormone therapy has altered Norsworthy's physical appearance and voice such that she presents as a woman.  (FAC ¶ 20, ECF No. 10.)  These physical changes and dressing as a woman has helped Norsworthy's distress.  (Pl.'s Dep. 23:15-24: 3.)  In her own words, prison officials "have facilitated and they have made it possible for [her] to come to terms with who [she] really [is]."  (Pl.'s Dep. 29:4-5.)  Indeed, since her incarceration in 1987, Norsworthy has received ongoing mental health treatment, including referral to the California Medical Facility at Vacaville to address her gender issues in 2000, and ongoing mental health therapy.  (Coffin Rep. ECF No. 66-1 at 8-9.)

California regulations provide a process for inmate-patients to access medical care.  *See* Cal. Code Regs. tit. 15, § 3050 *et seq.*  Inmates requesting un-prescribed medical care or treatment must submit a CDCR Form 7362, entitled "Request for Medical Services."  Although Norsworthy had submitted several such requests seeking various treatments before this litigation commenced, she never submitted a medical request for sex reassignment surgery through the California Department of Corrections and Rehabilitation's (CDCR) process for requesting medical services.  (Pl.'s Dep. 106:17-107:5.)  Instead, she submitted a medical request for sex reassignment surgery on October 22, 2014, after this litigation commenced, upon the advice of her attorney.  (Pl.'s Grievance, Oct. 22, 2014, Bajwa Decl. ¶ 2, 4 , Ex. A, C at AGO005155-AGO005156.)  In the meantime, Norsworthy has become eligible for parole, and is scheduled to

---

[2] Hereinafter, ECF No. 62 will be referred to as "Pl.'s Mot.," and all page references are to the ECF pagination.

3

appear before the Board of Parole Hearings for potential release on March 25, 2015.  (Bajwa Decl. ¶ 2-3, Ex. B.)

## II.   NORSWORTHY SUBMITTED AN INMATE GRIEVANCE FOR SEX REASSIGNMENT SURGERY IN 2012.

In 2012, Norsworthy began treatment with Dr. Reese, a prison psychologist, regarding her ongoing mental health issues, primarily Post Traumatic Stress Disorder.  On November 29, 2012, Dr. Reese opined that if Norsworthy were not released on parole at an upcoming Board of Parole hearing, she should be scheduled for sex change surgery.  (ECF No. 68 at 13-14.)  In his three brief progress notes, Dr. Reese does not explain his reasoning for determining that Norsworthy was an appropriate candidate for sex reassignment surgery, or state that it was medically necessary as a treatment for her gender dysphoria.  Instead, the notes reflect Dr. Reese's assertion that "in his opinion, health, safety, fairness and justice mandate" sex reassignment surgery for Norsworthy's "continued well-being."  (ECF No. 68 at 56.)  As Defendants' medical consultant Dr. Stephen Levine has noted, there is "no detailed psychological explanation for [Norsworthy's] readiness other than the consistent statements that the inmate's estrogen and testosterone levels have him as biologically female as possible."  (Bajwa Decl. ¶ 8, Ex. G, Levine Report at 13.)  And "there is no mention of [Dr. Reese] having explored in detail the deeper motives for sex reassignment surgery—that is, nothing was recorded in the notes."[3]  (*Id.*)

On September 16, 2012, Norsworthy submitted a CDCR Form 602 inmate grievance regarding her gender dysphoria.  (Pl.'s Grievance dated Sept. 16, 2012, Bajwa Decl. ¶ 2, 4 , Ex. A, C at AGO003294-AGO003297.)  In this grievance, Norsworthy asserted that she had not received "adequate and sufficient medical care as it relates to [her] Gender Identity Disorder."  (*Id.*)  Norsworthy's motivation for submitting this grievance was her recent knowledge that a federal district court had ruled in favor of gender reassignment surgery for a Massachusetts

---

[3] As further explained below in section V, Dr. Levine is a renowned specialist in treating transgender individuals, was previously a member of the World Professional Association for Transgender Health, and was appointed the district court's independent expert in *Kosilek v. Spencer*, the leading case involving an inmate's request for sex reassignment surgery.

4

1   inmate, Michelle Kosilek. (*Id.;* Pl.'s Dep. 95:10-97:4.) Prison officials reviewed this grievance

2   at multiple levels, reviewing Norsworthy's medical treatment and file while doing so. (Pl.'s

3   Grievance dated Sept. 16, 2012 at AGO003298-AGO003301; *see generally,* Coffin Rep., ECF

4   No. 66-1.)

5           As part of this inmate grievance review, Norsworthy was referred to a licensed

6   psychologist, Dr. Raymond Coffin, who performed a "Gender Identity Disorder Evaluation" on

7   July 1, 2013.[4] After reviewing Norsworthy's central file and complete medical record, and

8   meeting with Norsworthy, Dr. Coffin found that Norsworthy met the criteria for Gender Identity

9   Disorder under the DSM-IV, and concluded that she had received mental health services

10  appropriate for this diagnosis. (Coffin Rep. ECF No. 66-1 at 17.) But Dr. Coffin concluded that

11  she did not meet the criteria for sex reassignment surgery because she had not been fully

12  evaluated, recommended, and approved for sex reassignment surgery by the appropriate medical

13  and psychological staff. (*Id.* at 20-22.) Specifically, Dr. Coffin found that Dr. Reese's progress

14  notes on this issue did not point to anything supporting his conclusion that Norsworthy "has not

15  achieved 'normal mental health,' nor evidence supporting his recommendation that a sex change

16  operation would be the appropriate effective intervention." (*Id.* at 18.) Dr. Coffin recommended

17  that Norsworthy continue her current hormone therapy and medical treatment, and focus her

18  mental health treatment on improving coping mechanisms and addressing concerns raised by the

19  parole board. (*Id.*)

20          No medical doctor has informed Norsworthy that sex reassignment surgery is medically

21  necessary for her. (Pl.'s Dep. 34:14-19.) Dr. Kohler did not specifically discuss sex

22  reassignment surgery with Norsworthy, and Norsworthy never requested a referral for surgery

23  from Dr. Kohler. (*Id.* at 129:16-21.) The only professional to tell her that sex reassignment

24  surgery was necessary or appropriate is her former psychologist, Dr. Reese. (*Id.* 34:25-35:4.)

25          [4] Norsworthy's expert declaration from Dr. Nick Gorton assails Dr. Coffin's assessment.
    (Gorton Decl. ¶¶ 29-32.) But Dr. Gorton is a medical doctor, and there is no indication that he
26  has expertise to opine on mental health issues. (Gorton Decl. ¶ 2.) On the other hand, Dr. Coffin
    is a licensed psychologist. (Bajwa Decl. ¶ 7, Ex. F, Coffin Dep. at 19-21.) Dr. Levine reviewed
27  Dr. Coffin's report, and concluded that Dr. Coffin is qualified to opine on the medical necessity
    of sex reassignment surgery for Norsworthy. (Levine Report at 9.)

28

1
2

### III. THE FEDERAL COURT-APPOINTED RECEIVER APPROVED REGULATIONS DIRECTING THE AVAILABILITY OF MEDICAL SERVICES ON THE BASIS OF MEDICAL NECESSITY.

3    On February 14, 2006, the district court in *Plata v. Schwarzenegger*, No. C01-1351-TEH

4 (N.D. Cal.), appointed a federal receiver to oversee the provision of medical care in California

5 prisons.  (Request for Judicial Notice (RJN), Ex. A, Order Appt. Rec.)  Order Appt. Rec.[5]; *Plata*

6 *v. Schwarzenegger*, 603 F.3d 1088, 1092 (9th Cir. 2010).  "The Receiver [exercises] all powers

7 vested by law in the Secretary of the CDCR as they relate to the administration, control,

8 management, operation, and financing of the California prison medical health care system."

9 (RJN, Ex. A, Order Appt. Rec. at 4.)  In short, the *Plata* receiver has "all the powers of the

10 Secretary of the CDCR with respect to the delivery of medical care."  *Id.*  At the same time, the

11 district court suspended the CDCR Secretary's authority over medical care.  *Id.*  Further, although

12 the receiver was directed to exercise his powers "in a manner consistent with California state

13 laws, [and] regulations," he has the authority to waive any state regulation that prevents him from

14 carrying out his duties.  (RJN, Ex. A, Order Appt. Rec. at 5.)

15    Under California regulations, vaginoplasty is provided only on the basis of medical need.

16 Cal. Code Regs. tit. 15, § 3350.1(d).  (RJN, Ex. B, Leg. History at 74-76.)  According to the

17 administrative record, section 3350.1 was enacted to ensure that all inmates receive consistent and

18 standardized health care services based on medical necessity.  (RJN, Ex. B, Leg. History at 1-2,

19 97-99.)  The regulations do not deny any inmate access to an evaluation, diagnosis, or essential

20 treatment because of gender or transgender status.  (*Id.*)  Although Section 3350.1(b) states that

21 CDCR will not provide vaginoplasty (or other procedures such as vasectomy and tubal ligation) if

22 not based on a medical need, even these restricted procedures "may be provided" under section

23 3350.1(d) if prescribed by a treating physician and subject to a finding by a utilization

24 management committee that they are "clinically necessary."  (*Id.* at 15, 40.)  The *Plata* court

25
26

---

27    [5] The Order Appointing Receiver and the legislative history for California Code of Regulations, title 15, § 3350.1 is attached to this motion.  Per Federal Rule of Evidence 201(b), this Court can take judicial notice of it.

28

1   approved section 3350.1 as part of its oversight of CDCR's medical care and to ensure the

2   necessary regulator authority for constitutionally adequate medical treatment.  (*Id.* at 97-99.)

3       Norsworthy did not submit such a form seeking sex reassignment surgery until October 22,

4   2014, after this litigation commenced.  (Pl.'s Grievance, Oct. 22, 2014 at AGO005155-

5   AGO005156.)  CDCR then obtained an expert medical opinion from Dr. Levine as to

6   Norsworthy's suitability for sex reassignment surgery.  As discussed below, Dr. Levine opined

7   that this surgery is not presently medically necessary.

8

9   **IV.   DEFENDANTS' EXPERT CONSULTANT HAS DETERMINED THAT SEX REASSIGNMENT SURGERY IS NOT MEDICALLY NECESSARY AT THIS TIME.**

10      Dr. Stephen Levine, a licensed psychiatrist, received his medical degree in 1967 from the

11  Case Western Reserve University School of Medicine.  (Levine Report at 1.)  He has been a

12  member of the American Psychiatric Association (APA) since 1971.  (*Id.*)  Since 2005, he has

13  been an APA Distinguished Life Fellow.  (*Id.*)  Currently, he is a clinical professor of psychiatry

14  at the Case Western Reserve University School of Medicine, and has written extensively about

15  psychiatric issues and sexual functioning.  (*Id.*)  He has been teaching and providing clinical care

16  since 1973.  (*Id.*)  He is the editor of the Handbook of Clinical Sexuality for Mental Health

17  Professionals, which is being prepared for its third edition.  (*Id.*)  He has written numerous journal

18  articles regarding gender problems.  (*Id.*)  In 2005, he received a lifetime achievement Masters

19  and Johnson's Award from the Society for Sex Therapy and Research.  (*Id.*)

20      Additionally, Dr. Levine was previously a member of the Harry Benjamin International

21  Gender Dysphoria Association, the precursor to the World Professional Association for

22  Transgender Health (WPATH).  (*Id.*)  In this capacity, he was a chairman of the Standards of

23  Care Committee in 1997-98.  (*Id.*)  Of particular relevance here, Dr. Levine was retained as the

24  district court's independent expert in a recent case involving transgender inmate care, *Kosilek v.*

25  *Spencer*, 889 F. Supp. 2d 190, 227 (D. Mass. 2012), *reversed by Kosilek v. Spencer*, 774 F.3d 63

26  (1st Cir. 2014) (en banc).  He also has previously been retained as an expert in two other federal

27  cases involving transgender prisoner claims, *Soneeya v. Spencer*, No. 07-12325-JLT (D. Mass.),

28  and *De'Lonta v. Clarke*, 11-cv-00257 (W.D. Va.).  (Levine Report at 1.)

7

**A.  Dr. Levine agrees with Dr. Coffin's assessment regarding Norsworthy's readiness for sex reassignment surgery.**

Dr. Levine reviewed Dr. Coffin's report, and concluded that Dr. Coffin is qualified to opine on the medical necessity of sex reassignment surgery for Norsworthy.  (Levine Report at 9.) After reviewing Dr. Coffin's report and conclusions, Dr. Levine agreed with the assessment that sex reassignment surgery was not medically necessary for Norsworthy in 2012-13.  (*Id.* at 11-12.) Dr. Levine found that this decision "was a conservative and prudent one," and that "sex reassignment surgery was not at the time a medical necessity," in part because there are "other ways to diminish the inmate's gender dysphoria short of this irreversible surgery."  (*Id.* at 12.) "Rather than viewing sex reassignment surgery as the ultimate treatment for the pain of gender dysphoria, it should be viewed as a weighty step with social, psychological, medical, and environmental consequences."  (*Id.*)  In this regard, Dr. Levine concluded, "Prison officials are wise to not simply accept one clinician's opinion without articulated compelling reasoning."  (*Id.*) Notably, the WPATH standard regarding sex reassignment surgery recommends that two independent reasoned evaluations by qualified clinicians be obtained before proceeding with sex reassignment surgery.  (*Id.*)

**B.  Dr. Levine's examination confirmed that sex reassignment surgery is not immediately medically necessary.**

Under the parties' stipulation and this Court's order, Dr. Levine conducted an Independent Mental Examination of Norsworthy under Federal Rule of Civil Procedure 35.  (ECF No. 54.) Dr. Levine met with Norsworthy for over two hours to discuss her gender dysphoria.  (Levine Report at 12.)  He also reviewed reports prepared by psychologists for Norsworthy in connection with her parole hearings in 2009, 2012, and 2014.  (*Id.*)  And he reviewed Dr. Reese's progress notes pertaining to his meetings with Norsworthy, and her medical records and endocrine reports for the past three years.  (*Id.*)

Dr. Levine agrees that Norsworthy was correctly diagnosed as transsexual.  (Levine Report at 15.)  Moreover, Norsworthy meets some of the criteria for sex reassignment surgery under the WPATH guidelines, including: 1) persistent and well documented gender dysphoria; 2) the

8

1    capacity to make a fully informed decision and consent for treatment; 3) age of majority; 4)

2    stabilized mental health problems; and 5) twelve continuous months of hormone treatment.

3    (Levine Report at 23.)  But she lacks at least two key components to be recommended for sex

4    reassignment surgery: 1) "She does not have any time, let alone 12 months, of continuous living

5    in the female gender role in society," and 2) "She does not have two separate mental health

6    professionals' letters of recommendation based upon independent evaluations."  (Levine Report

7    at 24.)

8            Further, Dr. Levine opined that Norsworthy's situation does not present a case where

9    *immediate* sex reassignment surgery is medically necessary.  (Levine Report at 21.)  First, it is not

10   medically necessary to save Norsworthy's life—"her life is not in danger because of the condition

11   of Gender Dysphoria."  (*Id.*)  Second, "sex reassignment surgery is not medically necessary to

12   prevent a major psychological or medical decompensation."  (*Id.*)  While not being granted

13   immediate sex reassignment surgery will likely disappoint Norsworthy, any resulting depression

14   can be addressed through the mental health services available in prison.  (*Id.*)  Moreover,

15   Norsworthy's "liver disease [is not] a reason to perform sex reassignment surgery" because any

16   deterioration of her liver function can and has been reversed by lowering her dosage of estrogen.

17   (*Id.*)  The only potential side effect of lowering the estrogen dosage would be the lack of ability of

18   her body to maintain her breast tissue, also not a reason to perform the surgery.  (*Id.*)  Dr. Gorton

19   points to Norsworthy's liver functioning as a purported reason why sex reassignment surgery is

20   necessary.  (Gorton Decl. ¶¶ 35-37.)  But the record shows that prison medical staff continually

21   monitor and address Norsworthy's hormone treatment and liver functioning.  (Munir Decl. ¶ 5.)

22   Moreover, the surgery Norsworthy seeks is, like any surgery, not without its own medical risks.

23   Lastly, though sex reassignment surgery "would diminish her gender dysphoria," Norsworthy has

24   lived with this distress for 15 years, and the distress "does not constitute a necessity for

25   immediate sex reassignment surgery."  (Levine Report at 22.)

26           Dr. Levine pointed to other factors militating against immediate sex reassignment surgery

27   for Norsworthy.  "WPATH and experienced clinicians recognize that many individuals make

28   adaptations to their Gender Dysphoria symptoms without sex reassignment surgery."  (Levine

9

1   Report at 22.)  Further, "sex reassignment surgery will not significantly improve Michelle's

2   ability to function in prison."  (*Id.* at 23.)  To the contrary, "immediate sex reassignment surgery

3   while residing in Mule Creek Corrections facility for men will pose new safety issues, which may

4   keep her more isolated from other inmates or lead to a transfer to a female prison."  (*Id.*)

5          Dr. Levine noted that in medicine, a "medical necessity" for immediate surgery means that,

6   absent surgical intervention, "a serious worsening of the patient's physiological state is

7   inevitable."  (*Id.* at 25.)  By contrast, "sex reassignment surgery is always an elective procedure.

8   There is no immediacy to it.  It is not a response to an acute situation.  Patients wait until they can

9   gather the funds for the procedure, have post operative support system in place and have mastered

10  the expected pre-surgical second thoughts."  (*Id.*)

11

12  **V.     PROVIDING SEX REASSIGNMENT SURGERY WILL POSE NEW AND COMPLEX SAFETY ISSUES.**

13         Attempting to provide Norsworthy with safe housing options were she to undergo sex

14  reassignment surgery would also present significant safety and administrative concerns.  (Decl. K.

15  Harrington Supp. Defs.' Opp'n Mot. for Prelim. Inj. ¶¶ 6-8.)  If Norsworthy were to have sex

16  reassignment surgery, housing her as an anatomically female inmate in an all-male facility would

17  unacceptably increase the potential that she would be targeted for violence, including assault and

18  rape. (*Id.* ¶ 6.)   On the other hand, Norsworthy's post-sentencing probation report shows that

19  shortly before committing the murder that resulted in her life sentence, she threatened her then-

20  girlfriend with bodily harm and was arrested for threatening to bomb her girlfriend's home.  (*Id.* ¶

21  4.)  That prior history raises concerns about transferring Norsworthy to a female institution,

22  where a significant number of female inmates have been victims of domestic violence and abuse.

23  Placing Norsworthy at a female institution poses the risk that she could be targeted for assault or

24  victimization by other inmates, or conversely, that Norsworthy might herself be deemed a threat

25  to other inmates.  (*Id.*)  And given her ongoing mental health treatment, Norsworthy could not be

26  housed at length in administrative segregation or a Security Housing Unit.  (*Id.* ¶ 8; *see also*

27  Order, ECF 5131 at 46-55, *Coleman v. Brown,* No. 2:90-cv-00520 KJM-DAD (E.D. Cal.).

28  Accordingly, attempting to house Norsworthy in housing consistent with a post-surgery

10

correctional classification, while at the same time keeping her and others in CDCR's institutions safe and secure, would raise significant administrative and security concerns.

## ARGUMENT

**I.   UNDER THE STRINGENT MANDATORY INJUNCTION STANDARD, INJUNCTIVE RELIEF IS NOT NECESSARY.**

As a preliminary matter, Norsworthy misstates the legal standard applicable to her request for a preliminary injunction ordering CDCR to provide sex reassignment surgery and "additional treatment." (Pl.'s Mot. at 18.) While a "prohibitory injunction" prohibits a party from taking action and preserves the status quo, a mandatory injunction orders a responsible party to "take action." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014). A mandatory injunction "goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted); *see also Citizens United v. Gessler*, 773 F.3d 200, 218 n.12 (10th Cir. 2014) ("Three types of preliminary injunctions are specifically disfavored: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.") (citation omitted).

When a party seeks a mandatory injunction, relief should not be granted "in doubtful cases." *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879. "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citation omitted); *Ferring Pharm., Inc. v. Watson*, 765 F.3d 205, 219 n.3 (3d Cir. 2014) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.") (citation omitted). That is especially true when the injunction will, as here, effectively adjudicate the case on the merits, providing the moving party with all the relief sought via the litigation absent a trial to develop the facts or any final judgment of legal entitlement to the requested relief. (*Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994), *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) ["In

11

general, to show irreparable harm a plaintiff must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial."].)  With this stringent standard in mind, Norsworthy is not entitled to preliminary injunctive relief.

**II.     THE LAW AND FACTS DO NOT CLEARLY FAVOR INJUNCTIVE RELIEF UNDER THE EIGHTH AMENDMENT.**

To maintain an Eighth Amendment medical claim, an inmate must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' [citation] are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  An inmate has a serious medical need if failing to treat the condition "could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

Deliberate indifference means that a doctor knew of and disregarded an excessive risk to the inmate's health, that the doctor knew of facts from which the inference could be drawn that a substantial risk of serious harm existed, and the doctor drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Because deliberate indifference is a "high legal standard," even a doctor's grossly negligent diagnosis or treatment of a medical condition is insufficient to establish an Eighth Amendment violation. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004); *see Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) ("While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice."); *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) ("Before it can be said that a prisoner's civil rights have been abridged, however, the indifference to his medical needs must be substantial.").  Nor does a difference of medical opinion between prison physicians and other medical providers establish deliberate indifference to serious medical needs. *Toguchi,* 391 F.3d at 1057.

## A. Norsworthy has not been deprived of constitutionally adequate care.

Norsworthy contends that Defendants were deliberately indifferent to her gender dysphoria by not providing sex reassignment surgery. (Pl.'s Mot. 13-14.)  Specifically, she argues that Defendants have disregarded her medical needs by "ignor[ing] both [her] symptoms and the internationally recognized Standards of Care." (*Id.* at 13.)  The record belies this—in fact, Defendants have provided Norsworthy with appropriate and continuous treatment for her gender dysphoria for the past 15 years, beginning with referring her to Dr. Viesti in 1999 for transsexual assessment, consultation with various endocrinologists, mental health treatment and counseling, and hormone therapy.  The mental health treatment and hormone therapy has changed her physical appearance and voice to that of a woman and helped Norsworthy to successfully consolidate her gender identity.  (*See, e.g.,* Pl.'s Mot. at 11-12; FAC ¶ 20; Pl.'s Dep. at 23:15-24:3, 29:4-5.)  Moreover, her mental distress has been alleviated such that her own experts find that she presently experiences at most "mild" depression or anxiety.  (Ettner Decl. ¶ 70.)  This 15-year treatment history is not indifference—much less deliberate indifference—to Norsworthy's needs.  In fact, it aligns with the type of care that other courts have found appropriate for transgender inmates.

For example, in *Kosilek v. Spencer*, the First Circuit rejected an inmate's claim that prison officials should provide her sex reassignment surgery for her gender dysphoria given that she had been provided "such alleviative measures as psychotherapy, hormones, electrolysis, and the provision of female garb and accessories." *Kosilek*, 774 F.3d at 86, 89.[6]  Similarly, the Seventh Circuit has reasoned in this context that a complete denial of treatment to a transgender inmate would violate the Eighth Amendment, but added that "[i]t is important to emphasize, however, that [the plaintiff] does not have a right to any particular type of treatment." *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987); *Murray v. U.S.B.O.P.*, 106 F.3d 401 (6th Cir. 1997)

---

[6] Norsworthy dismisses the First Circuit's en banc decision as "wrongly decided." (Pl.'s Mot. at 30.)  As the authoritative decision of an appellate court sitting en banc, *Kosilek* is highly persuasive authority, notwithstanding Norsworthy's disagreement with that ruling.

1    (table) (where "the prisoner is receiving treatment, the dosage levels of which are based on the

2    considered professional judgment of a physician, [the court is] reluctant to second-guess that

3    judgment").

4         At heart, Norsworthy's complaint is that Defendants have not provided her with the

5    particular treatment she wants, namely sex reassignment surgery and unspecified "additional

6    treatment."  But the case law does not require that prison officials give an inmate the treatment

7    that he or she thinks is necessary.  "Although the Constitution does require that prisoners be

8    provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner

9    the treatment of his choice."  *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988).  The Eighth

10   Amendment requires only that a prisoner be afforded "reasonable measures to meet a substantial

11   risk of serious harm to her," not that she be given the specific care she demands.  *Forbes v.*

12   *Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).  Instead, "the essential test is one of *medical necessity*

13   and not one simply of desirability."  *Id.* (emphasis added; citation omitted); *see also Kosilek*, 774

14   F.3d at 82 (noting that the deliberate indifference standard "does not impose upon prison

15   administrators a duty to provide care that is ideal, or of the prisoner's choosing").

16

17              **B.    Norsworthy has not clearly established that immediate sex**
                        **reassignment surgery is medically necessary.**

18

19        The above analysis highlights another weakness in Norsworthy's argument for preliminary

20   relief: she has not demonstrated that sex reassignment surgery is medically necessary treatment

21   for her gender dysphoria *now*.  Under the case law, "a plaintiff must *demonstrate* immediate

22   threatened injury as a prerequisite to preliminary injunctive relief."  *Caribbean Marine Svcs. Co.,*

23   *Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  Evidence about speculative or remote harms

24   does not suffice to justify preliminary injunctive relief.  *Id.* at 675.

25        Norsworthy's motion does not argue, much less demonstrate, that she will suffer immediate

26   injury if she does not obtain injunctive relief at this point.  (*See generally,* Pl.'s Mot.)  In fact,

27   there is no evidence that she will suffer from severe emotional distress, or that she will resort to

28   self-mutilative behavior, like auto-castration.  (Levine Report 21-23.)  Norsworthy's own expert,

                                                  14

1    Dr. Ettner, notes that Norsworthy evinces "mild symptoms of depression."  (Ettner Decl. ¶ 70.)[7]

2    Although she evinces symptoms of gender dysphoria, there is no indication that these symptoms

3    are extreme.  (*Id.* ¶¶ 72, 75.)  Further, though Dr. Ettner opines that gender dysphoria can lead to

4    emotional decompensation and "externalizing behaviors such as suicide or surgical self-

5    treatment," he does not describe any such concerns specific to Norsworthy herself.  (*Id.* ¶ 75.)[8]

6    And, as noted below, Norsworthy has been treated for gender dysphoria for over 20 years—there

7    is no indication that her condition has somehow worsened to the point where she must obtain sex

8    reassignment surgery *now* rather than waiting until this case produces a final judgment on the

9    merits.  Dr. Ettner opines that Norsworthy requires sex reassignment surgery, which he claims

10   should be "immediately implemented," but he does not explain the reason for the urgency.  The

11   Court is not bound by this unsupported statement.  Fed. R. Civ. P. 26(a)(2)(B)(i); *Finwall v. City*

12   *of Chicago*, 239 F.R.D. 494, 501 (N.D. Ill. 2006) ("Expert reports must include 'how' and 'why'

13   the expert reached a particular result, not merely the expert's conclusory opinions.").  Ultimately,

14   Norsworthy submits no evidence—much less evidence to clearly establish—that she will suffer

15   irreparable harm unless she receives immediate, mandatory injunctive relief.

16          Norsworthy's reliance on Dr. Gorton's declaration is likewise misplaced.  Dr. Gorton

17   opines that Dr. Coffin's methodology is "neither appropriate nor reflective of the current

18   standards by which transgender patients are treated."  (Gorton Decl. ¶ 32.)  But Dr. Gorton is not

19   a psychologist, and thus his expertise to opine on Dr. Coffin's report is questionable.  (Gorton

20   Decl. ¶ 2.)  Dr. Gorton points out cases where transgender individuals have resorted to self-

21   castration when denied access to hormones or sex reassignment surgery.  (Gorton Decl. ¶ 36.)

22   But Norsworthy has not been denied hormones, and she has denied any intention to self-mutilate.

23

24          [7] Defendants have not had the opportunity to conduct discovery on Dr. Ettner's
     background and experience, and reserve the right to challenge his qualifications as an expert
     under the Federal Rules of Evidence.

25          [8] Norsworthy also submitted the declaration of Dr. Marci Bowers, a medical doctor.
     (Bowers Decl.)  Dr. Bowers did not review Norsworthy's medical file or meet with her.  (*Id.* at
26   13.)  Although she states that "surgery for many people is a medically necessary treatment needed
     to treat gender dysphoria," she does not opine that it is medically necessary for Norsworthy, let
27   alone that it must be provided without delay.  (*Id.* at ¶ 31.)  Accordingly, her declaration is not
     relevant to whether Norsworthy can establish entitlement to preliminary injunctive relief.

28

15

1    (Levine Report at 16.)  Although Dr. Gorton also points to Norsworthy's liver functioning as a

2    purported reason why sex reassignment surgery is necessary, prison medical staff continually

3    monitor and adjust Norsworthy's estrogen levels.  (Munir Decl. ¶ 5.)  In any event, if

4    Norsworthy's concern is her liver treatment, the appropriate remedy is to seek liver treatment or

5    to modify her hormone therapy, not to undergo sex reassignment surgery.

6         *Kosilek* is particularly instructive.  As the First Circuit explained, "[I]t's the particular risk

7    of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of

8    the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth

9    Amendment purposes."  774 F.3d at 89 (citation omitted).  In other words, the key question is

10   whether denying sex reassignment surgery to Norsworthy is deliberately indifferent to a serious

11   risk of harm that this denial will cause her.  But here, Norsworthy has not clearly established that

12   denial of sex reassignment surgery will create a serious risk of harm.  As Dr. Levine pointed out,

13   "her life is not in danger because of the condition of Gender Dysphoria."  (Levine Report at 21.)

14   To the contrary, the record reflects that "sex reassignment surgery is not medically necessary to

15   prevent a major psychological or medical decompensation" to Norsworthy.  (Levine Report at

16   21.)  And, as noted above, there is no indication that Norsworthy will engage in self-mutilative

17   behavior if she does not obtain sex reassignment surgery.  (*Id.*)  Although denial of sex

18   reassignment surgery may cause Norsworthy disappointment and depression, these can be

19   addressed through the Department's mental health system, which has provided her support in the

20   past.  *See Kosilek*, 774 F.3d at 90 (rejecting Eighth Amendment claim for sex reassignment

21   surgery in part because the prison officials "stand[] ready to protect [the inmate-plaintiff] from

22   the potential for self-harm by employing its standard and accepted methods of treating any

23   prisoner exhibiting suicidal ideation").

24        Further, medical professionals differ on whether and when sex reassignment surgery is

25   necessary for the mental distress that accompanies gender dysphoria.  Dr. Levine noted that "sex

26   reassignment surgery is always an elective procedure.  There is no immediacy to it.  It is not a

27   response to an acute situation.  Patients wait until they can gather the funds for the procedure,

28   have post operative support system in place and have mastered the expected pre surgical second

16

1   thoughts." (*Id.*)  In fact, "WPATH and experienced clinicians recognize that many individuals

2   make adaptations to their Gender Dysphoria symptoms without sex reassignment surgery."

3   (Levine Report at 22.)

4          None of Norsworthy's proffered evidence on this point negates the reasoned medical

5   judgment to deny sex reassignment surgery at this time, much less clearly establish that a

6   mandatory injunction is warranted.

7

8                    **C.     Norsworthy's difference of opinion regarding her treatment
                             does not demonstrate a likelihood of success on the merits.**

9          At best, Norsworthy's declarations supporting her motion demonstrate a difference of

10   opinion as to whether her specific case requires sex reassignment surgery, which, under the case

11   law, is insufficient to establish deliberate indifference under the Constitution.

12          Where, as here, there is a dispute about treatment options, the inmate must demonstrate that

13   the course of treatment chosen by prison physicians was "medically unacceptable under the

14   circumstances" and chosen in "conscious disregard of an excessive risk" to his health.  *Toguchi*,

15   391 F.3d at 1057; *see Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) ("A difference of

16   opinion does not amount to a deliberate indifference to Sanchez'[s] serious medical needs.").  The

17   "essential test is one of medical necessity and not simply one of desirability." *Dean v. Coughlin*,

18   804 F.2d  207, 215 (2nd Cir. 1986) (citations omitted).

19          In the sex reassignment surgery context, the federal court that most recently confronted this

20   issue found this principle determinative.  "The law is clear that where two alternative courses of

21   medical treatment exist, and both alleviate negative effects within the boundaries of modern

22   medicine, it is not the place of our court to 'second guess medical judgments' or to require that

23   the [defendants] adopt the more compassionate of the two adequate options." *Kosilek*, 774 F.3d

24   at 90.  In light of this, Norsworthy has not made the high threshold showing warranting a

25   mandatory preliminary injunction—she has not shown that "the facts and the law clearly favor"

26   her. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *see Marlyn Nutraceuticals*,

27   571 F.3d at 879 ("In general, mandatory injunctions 'are not granted unless extreme or very

28   serious damage will result and are not issued in doubtful cases . . .'") (citation omitted).

17

### D.  The Constitution does not require that Norsworthy be referred to a "transgender specialist."

As a fallback, Norsworthy faults prison officials for not referring her to a "transgender specialist."  (Pl.'s Mot. at 23-24.)  She also faults prison officials for not conferring with Dr. Kohler about Norsworthy's inmate grievance.  (*Id.*)  But Dr. Kohler had not been involved in Norsworthy's care since 2011.  (Kohler Dep. 127:8-21; 129: 16-21.)  Further, Dr. Kohler did not recommend sex reassignment surgery, nor did Norsworthy request such a recommendation from her.  (*Id.*)  Norsworthy also relies on deposition testimony from Dr. Kohler to argue that Defendants have a de facto "blanket policy" against sex reassignment surgery.  (Pl.'s Mot. at 21-23, 25.)  But Dr. Kohler acknowledged in that same deposition that she has not been involved in policy-making decisions for CDCR since 2008.  (Kohler Dep. at 58:4-7, 60:4-10, 63:3-5.)  She had not "looked at the CDCR latest policy in a while," and so was "not certain whether it excludes surgery specifically."  (*Id.* at 44:4-13; 44:18-45:3.)  She further explained: "I haven't been involved in transgender care for the CDCR for a few years now so I . . . can't say."  (*Id.* at 63:3-5.)  And although Dr. Kohler testified that she "believes" CDCR disfavors sex reassignment surgery, she did not cite specific examples where that treatment was denied.  (Kohler Dep. at 129: 16-21.)

Norsworthy also argues that Dr. Coffin is unqualified to render an opinion regarding her need for sex reassignment surgery.  (Pl.'s Mot. at 25-26.)  But Norsworthy does not cite any evidence that the American Psychological Association recognizes or requires transgender specialization.  In Dr. Levine's opinion, "A licensed psychologist with more than a few years of professional clinical experience is qualified to opine on the necessity of sex reassignment surgery for an individual with gender identity dysphoria."  (Levine Report at 9.)  Accordingly, Dr. Coffin—a psychologist with thirty years of clinical experience who has treated individuals undergoing hormone therapy in the past—was qualified to assess Norsworthy's medical condition and the earlier administrative decisions finding that her medical record did not evince an immediate need for sex reassignment surgery.  (Coffin Dep. at p. 19-21.)

1    No authority requires prison officials to provide a particular form of treatment or to refer an

2    inmate to a particular physician to treat a condition.  In denying in part the motion to dismiss, this

3    Court determined that there was a question whether Defendants relied on "opinions of non-

4    specialized, inexperienced health care providers," in denying Norsworthy's requested surgery.

5    (ECF No. 38 at 13-14.)  But the record shows that a licensed therapist with more than a few years

6    of clinical experience can assess a patient's necessity for sex reassignment surgery.  (Levine Rep.

7    at 9.)  Dr. Coffin was adequately trained and experienced to assess the appropriateness of sex

8    reassignment surgery.  Moreover, Dr. Levine, a recognized expert in treating and assessing

9    transgender individuals, independently reviewed Norsworthy's medical and mental health

10   records, interviewed her, and agreed that sex reassignment surgery is not medically necessary for

11   her.  (Levine Rep. at 21-22.)

12   Norsworthy relies on distinguishable and non-binding authority regarding medical

13   conditions that involve severe pain and physical ailments.  (*Id.* at 17 (citing *McNearney v.*

14   *Washington Dep't of Corrs.*, No. C11-5930, 2012 WL 3545267 (W.D. Wash Aug. 16, 2012)

15   (bone fractures); *Miller v. Bannister*, No. 3:10-cv-00614-RCJ, 2011 WL 666106 (D. Nev. Feb. 9,

16   2011) (end stage liver disease); *Rosado v. Alameida*, 349 F. Supp. 2d 1240 (S.D. Cal. 2004) (liver

17   transplant).)  In fact, "[a] prison inmate has no independent constitutional right to outside medical

18   care additional to and supplemental to the medical care provided by the prison staff within the

19   institution."  *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986).  As early as 1976, the

20   Supreme Court made clear that the Constitution does not dictate medical methodology: "The

21   question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated

22   is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray,

23   or like measures, does not represent cruel and unusual punishment."  *Estelle,* 429 U.S. at 107;

24   *Sanchez,* 891 F.2d at 242 (A difference of opinion between a physician and the prisoner—or

25   between medical professionals—concerning what medical care is appropriate does not amount to

26   deliberate indifference.).  As the Seventh Circuit explained, "The Constitution is not a medical

27   code that mandates specific medical treatment."  *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir.

28   2008) (citation omitted).

1  **III.   NORSWORTHY IS NOT LIKELY TO SUCCEED ON HER EQUAL PROTECTION CLAIM,
WHICH IN ANY EVENT WOULD NOT ENTITLE HER TO AN ORDER DIRECTING CDCR
2  TO PROVIDE SURGERY THAT IS NOT MEDICALLY NECESSARY.**

3        Norsworthy also argues briefly that Defendants have intentionally treated her differently

4  than other similarly situated inmates seeking vaginoplasty by barring her access to sex

5  reassignment surgery "even after the surgery was found to be medically necessary to treat her

6  gender dysphoria." (Pl.'s Mot. at 31; FAC at ¶ 56-55.)  To the extent this claim is distinct from

7  Norsworthy's Eighth Amendment challenge to the treatment decisions made by CDCR's medical

8  professionals in her case, it rests on allegations that CDCR has a "blanket policy" of denying

9  vaginoplasty surgery for purposes of sex-reassignment that reflects purposeful discrimination

10  against transgender persons.  (Pl.'s Mot. at 28.)  But CDCR has no such policy.  The applicable

11  regulation differentiates on the basis of medical necessity, not based on particular conditions or an

12  inmate's transgender status.  And, as demonstrated above, CDCR's treatment decisions in

13  Norsworthy's case reflect professional judgments about medical necessity, not any discriminatory

14  animus toward Norsworthy or her transgender status.

15

16        **A.     The governing regulation does not discriminate against
transgender individuals.**

17        As discussed above, the regulation governing the availability of surgical treatment in

18  Norsworthy's case is California Code of Regulations, title 15, section 3350.1, as approved by the

19  court in *Plata v. Schwarzenegger*.  Norsworthy asserts that that section 3350.1 "explicitly

20  discriminate[s] on the basis of gender/transgender status" (Pl.'s Mot. at 32 & n.2), but that is not

21  correct.  Nothing in the provision states that vaginoplasty will only be performed on persons

22  identified as female at birth, or to treat conditions other than gender dysphoria.  Rather,

23  vaginoplasty is authorized when it is "clinically necessary."  Cal. Code Regs. tit. 15, § 3350.1(d).

24        The history of the regulation confirms that it was adopted to ensure that all inmates receive

25  consistent and standardized health care services based on medical need, and does not deny any

26  inmate access to a medical evaluation, diagnosis, or essential medical care on the basis of any

27  immutable or suspect characteristic.  (RJN, Ex. B, Leg. History at 1, 2, 97-99.)  Although the rule

28  makes clear that certain procedures generally are *not* medically necessary, it also provides for

20

1   individualized review and authorizes the provision of those services in cases where they are

2   determined to be needed.  (*Id.*)  For example, although tubal ligation is listed among the normally

3   excluded services, it can be approved and provided in cases where it is deemed medically

4   necessary for the inmate-patient's health (e.g., if a pregnancy would create serious health risks).

5   (*Id.* at 15, 40*.*)  Similarly, vaginoplasty is a specialized procedure generally categorized as

6   "elective," meaning that it is not medically necessary in most circumstances, but may be

7   necessary in some.  (Vol. 5, Lawyers Medical Encyclopedia, § 36.14(b) (Matthew Bender);

8   Nichols, David H. and Clarke-Pearson, Daniel L., Gynecologic, Obstetric & Related Surgery, (2d

9   ed. 2000).)  In requiring individualized review before the provision of a procedure, such as sex-

10  reassignment surgery, that is often properly classified as elective, section 3350.1's requirement

11  for a case-by-case determination of "clinical necessity" is consistent with Medicare, California-

12  based Medicaid, and many private insurance companies' requirement that such procedures be

13  authorized only when properly determined to be medically necessary.[9]

14       Norsworthy argues that CDCR's Department Operations Manual, section 91020.26,

15  "expressly prohibit[s]" castration or vaginoplasty to treat gender dysphoria.  (Pl.'s Mot. at 24.)

16  But that manual does not have the force of law.  *Forest Guardians v. Animal & Plant Health*

17  *Inspection Serv.*, 309 F.3d 1141, 1143 (9th Cir. 2002) (Department of Agriculture's Forest Service

18  Manual not binding); *Western Radio Serv. Co., v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996).

19  Moreover, DOM section 12010.6 expressly provides that the regulations contained within Title

20  15 of the California Code of Regulations legally govern all of CDCR's institutions and programs.

21  Thus, even by the manual's own terms, section 3350.1—a properly adopted regulation approved

22  by the court and federal receiver overseeing inmate medical care—supersedes any contrary

23       [9] *G.B. v. Lackner*, 80 Cal. App. 3d 64 (Cal. Ct. App.); *see also* Center for Medicare and
     Medicaid Services, Publ. No. 100-03, Manual Medicare National Coverage Determinations
24   Transmittal 169, *available at* https://www.cms.gov/Regulations-and-
     Guidance/Gudiance/Transmittals/Downloads/R169NCD.pdf (last visited Mar. 3, 2015);
25   HealthNet National Medical Policy, Gender Reassignment Surgery, *available at*
     https://www.healthnet.com/portal/provider/content/iwc/provider/unprotected/working_with_HN/c
26   ontent/medical_policies.action (last visited Mar. 6, 2015); Aetna Clinical Policy Bulletin: Gender
     Reassignment Surgery, *available at* www.aetna.com/cpb/medical/data/600_699/0615.html (last
27   visited Mar. 3, 2015).

28

1  manual provision.  Under section 3350.1(d), a request for sex reassignment surgery is evaluated

2  like any other request for a covered surgical procedure, based on whether the requested care is

3  clinically necessary in the case of a particular patient.

4       As discussed above, although "surgery not medically necessary shall not be provided"

5  under section 3350.1, the regulation further states that treatment "excluded within these

6  regulations may be provided if the inmate's attending physician prescribes the treatment as

7  clinically necessary" and the service is approved by the appropriate CDCR medical committee.

8  Cal. Code Regs. tit. 15, § 3350.1.  Thus, CDCR's governing policy is to provide *any* surgery—

9  including vaginoplasty—that is clinically necessary, prescribed by an appropriate treating health

10 care professional, and approved by a medical committee.  Norsworthy can point to no policy—or

11 application of policy—that denies transgender inmates clinically necessary medical treatment.

12
13            **B.      Decisions relating to prison administration are subject to
                       deferential scrutiny under *Turner v. Safley*.**

14      Norsworthy argues in passing that because CDCR's policies or Defendants' actions reflect

15 intentional discrimination against her based on her transgender status, they are subject to

16 heightened constitutional scrutiny.  (*See* Pl.'s Mot. at 31-32 & n.2.)  As discussed above, however,

17 there is no factual predicate for that argument in this case.  CDCR's applicable regulations and

18 policies do not discriminate against Norsworthy or other transgender individuals on their face.

19 And to the extent that Norsworthy challenges applicable treatment procedures or the

20 determinations of medical necessity that have been made to date in her case, those challenges are

21 properly evaluated under the "deliberate indifference" standard in the context of Norsworthy's

22 Eighth Amendment claim.

23      If this case presented any occasion to reach the issue, Defendants note that constitutional

24 claims arising in the special context of correctional institutions are normally analyzed under the

25 deferential standards prescribed by *Turner v. Safley*, 482 U.S. 78, 89-91 (1987).[10]  Under that

26
27      [10] The *Turner* standard does not apply to claims of racial discrimination, or to those (such
        as claims of "deliberate indifference" in the provision of medical care) that are properly analyzed
        under the Eighth Amendment. *Johnson v. California*, 543 U.S. 499, 510-511 (2005).

28

1  standard, the most important factor in assessing policies or decisions relating to prison

2  administration is whether they bear a rational relationship to legitimate penological interests.  *See,*

3  *e.g.*, *Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001).  This approach to judicial review

4  recognizes that prison officials must have flexibility in matters of correctional administration and

5  should not be unduly constrained in framing "solutions to the intractable problems of prison

6  administration."  *Turner*, 482 U.S. at 89.

7         To be clear, use of the *Turner* standard would not shield any prison policy that was actually

8  based on nothing more than "a bare … desire to harm a politically unpopular group."  *U.S. Dep't*

9  *of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973).  Mere animus of that type "cannot constitute

10  a legitimate governmental interest."  *Id*.  As should be clear, however, from the fact that CDCR

11  provides ample support to transgender inmates—including psychological treatment, hormone

12  therapy, and facilitating changes to physical appearance—animus is not a motivating factor in

13  CDCR's decision not to provide sex reassignment surgery to plaintiff.  Rather, that decision is

14  based on CDCR's institutional judgments about what constitutes appropriate medical treatment,

15  as well as legitimate security concerns.

16         These justifications are sufficient to support CDCR's determination under any

17  constitutional analysis.  In the special context of prison administration, however, the many

18  choices that correctional authorities must make in administering their systems and facilities in a

19  safe, secure, and practical manner are due substantial deference.[11]  In the present context, for

20  example, subject to the requirements of the Eighth Amendment, prison administrators must be

21  allowed substantial flexibility in designing and implementing policies for the management of

22  transgender inmates in ways that are safe and appropriate both for those inmates themselves and

23  for others.  (*See, e.g.*, *Jamison v. Davue*, 2012 WL 996383, *3 (E.D. Cal. Mar. 21, 2012),

24  (discussing potential safety issues involved in placement of transgender inmate after sex-

25  reassignment surgery).)  The CDCR policies that bear on the present case are plainly reasonable

26  _____

27         [11] Even in the case of racial classifications, for example, the Supreme Court has recognized that "[p]risons are dangerous places, and the special circumstances they present may justify [otherwise suspect] classifications in some contexts."  *Johnson*, 543 U.S. at 515.

28

1   in light of the unsettled and evolving medical and social understandings of gender dysphoria and

2   related issues.  Under these circumstances, it is essential that courts grant appropriate deference to

3   policies or decisions adopted and implemented by prison officials in a good faith effort to

4   discharge their difficult and complex responsibilities.  And that sort of real but deferential judicial

5   review is appropriately conducted under the well-established *Turner* standard.

6

7
### C.   Immediate surgery would not be the remedy even if Norsworthy prevailed on her equal protection claim.

8        Even if Norsworthy could establish that she was likely to succeed on her equal protection

9   claim, that claim would not warrant preliminary injunctive relief in the form of an order directing

10  CDCR to provide immediate sex reassignment surgery or other medical treatment.  Because

11  Norsworthy's claim is that CDCR's policies precluded consideration of her request for treatment

12  on an equal basis, the appropriate remedy would be an order directing that her request for surgery

13  be assessed without regard to the "blanket policy" of denial of reassignment surgery that she

14  asserts exists and violates her rights.

15       As the Ninth Circuit has explained, the remedy for an equal protection violation is equality

16  of treatment, that is, to give the same opportunity to the aggrieved individual as those who were

17  arguably treated better.  *Servin-Espinoza v. Ashcroft*, 309 F.3d 1193, 1199 (9th Cir. 2002).  There,

18  an immigrant complained that his equal protection rights were violated because he was not

19  allowed to apply for relief under § 212(c) of the Immigration and Nationality Act.  The court held

20  that, because it was not feasible to go back and retroactively deny the § 212(c) relief that was

21  wrongly granted to excludable aliens, the only feasible way to provide equal treatment to Servin–

22  Espinoza was to give him the same opportunity to apply for § 212(c) relief as excludable aliens

23  has been given.  *Id.*  In *Edie v. Sarasota County*, the Eleventh Circuit addressed a property

24  owner's equal protection challenge to a county's land ordinance, and analyzed the appropriate

25  remedy for such challenges.  908 F.2d 716 (11th Cir. 1990).  "An equal protection challenge can

26  attack the statute on its face or as applied to the property involved.  [citation]  The remedy for a

27  facial challenge is to enjoin the local authority from enforcing the regulation . . . while the remedy

28  for an as applied challenge is an injunction against the unconstitutional application of the

24

1    regulation." *Id.* at 722; *cf. Handberry v. Thompson*, 436 F.3d 52, 70 (2d Cir. 2006) (noting that a

2    plaintiff's demand for a *substantive* remedy was inappropriate for a claimed procedural violation).

3          Here, if the regulation violates equal protection by precluding or interfering with the

4    consideration of some conditions or requests for medical treatment on an equal basis with others,

5    the remedy would not be to order that CDCR perform surgery on Norsworthy.  It would be to

6    order CDCR to provide her with access to medical procedures on the same basis as all other

7    individuals—that is, access to procedures that are deemed medically necessary by CDCR's

8    medical professionals.[12]

9

10   **IV.   NORSWORTHY CANNOT ESTABLISH IRREPARABLE INJURY REQUIRING AN
            IMMEDIATE INJUNCTION.**

11         Norsworthy was determined to be transgender in 1999, and has received continuous and

12   effective treatment since that date.  (FAC ¶ 18; Pl.'s Dep. 25-29.)  She did not seek sex

13   reassignment surgery through the prison's internal grievance process until this litigation

14   commenced in October 2012.  Now, she seeks immediate "preliminary" injunctive relief.  But she

15   can point to no relevant circumstances that make the provision of that surgery suddenly urgent.

16         Norsworthy's sole argument concerning the urgency of her motion is that denial of

17   constitutional rights warrants injunctive relief, citing *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir.

18   1983).  (Pl.'s Mot. at 27-28.)  In *Zepeda*, the district court enjoined a federal agency from

19   engaging in numerous actions that allegedly violated the Fourth Amendment, including

20   approaching homes to conduct immigration investigations without reasonable suspicion or

21   consent.  *Zepeda*, 753 F.2d at 723.  In that context, the Ninth Circuit held that the balance of

22   hardship tipped in the plaintiffs' favor, and that the defendants had no countervailing right against

23   being enjoined from identifiable constitutional violations.  *Id.* at 727.  Here, there is no like

24   showing that, under the status quo, Defendants are violating Norsworthy's rights.  Moreover,

25   *Zepeda* involved a prohibitory injunction, which is subject to a lower standard than the mandatory

26   ───────────────────
     [12] Any further challenge to the medical determinations made by those professionals would
27   be properly evaluated as a claim of "deliberate indifference" under the Eighth Amendment.  For
     the reasons set forth above, Norsworthy has not shown that sex reassignment surgery is medically
     necessary in her case.

28

1   injunction Norsworthy seeks.  *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993)

2   (holding that "'mandatory preliminary relief' is subject to heightened scrutiny and should not be

3   issued unless the facts and law clearly favor the moving party").

4       Norsworthy similarly misreads the Ninth Circuit's decision in *Chalk v. United States*

5   *District Court*, 840 F.2d 701 (9th Cir. 1988), to argue that a party's emotional distress "tip[s] the

6   balance" in all cases.  (Pl.'s Mot. at 35.)  Rather, *Chalk* held that emotional distress in conjunction

7   with other factors may be relevant to—but not dispositive of—the irreparable injury analysis.

8   840 F.2d 701, 709.  Defendants do not argue that Norsworthy's emotional distress should be

9   discounted, but it does not justify a sudden, pre-trial injunction directing doctors to provide an

10  inmate with irreversible surgery that CDCR physicians and experts have so far determined is not

11  medically necessary, or even necessarily advisable.  Norsworthy has been under treatment for her

12  gender dysphoria for more than fifteen years.  No evidence has been presented of a medical

13  urgency warranting immediate surgical intervention.

14      Additionally, the balance of hardships tips strongly in Defendants' favor.  In the best of

15  circumstances, whether surgery is medically indicated is a result of a deliberative process, one

16  that both the patient and the physician should undertake with a full understanding of the risks

17  involved.  Here, Norsworthy has not shown that her claimed emotional distress has increased

18  appreciably from the distress she has experienced in the past fifteen years.  Moreover,

19  Norsworthy has not had any time, let alone 12 months, of continuous living in the female gender

20  role in society, and she has not obtained two independent clinical evaluations recommending sex

21  reassignment surgery, consistent with WPATH guidelines. (Levine Report at 24.)  There is

22  simply no compelling reason for requiring surgery now.

23      Moreover, a court order mandating that the state provide Norsworthy with sex reassignment

24  surgery is fraught with a myriad of unexplored practical ramifications.  There is no precedent to

25  assess where Norsworthy should be housed if she undergoes sex reassignment surgery.  As Dr.

26  Levine noted, "Immediate SRS while residing in Mule Creek Corrections facility for men will

27  pose new safety issues, which may keep [Norsworthy] more isolated from other inmates or lead

28  to a transfer to a female prison."  (Levine Rep. at 23.)  As discussed above, serious security

26

1  concerns abound when an inmate undergoes sex reassignment surgery while in prison, and courts

2  should defer to prison officials in their assessment of such safety concerns. *Kosilek*, 774 F.3d at

3  93-94 ("The prison administrators in this case have decades of combined experience in the

4  management of penological institutions, and it is they, not the court, who are best situated to

5  determine what security concerns will arise.").

6       Lastly, once a court orders preliminary injunctive relief providing to a party all that she

7  seeks in the litigation, the defendant is potentially deprived of appellate review. *See Univ. of Tex.*

8  *v. Camenisch*, 451 U.S. 390, 398 (1981) ("[W]hether a preliminary injunction should have been

9  issued here is moot, because the terms of the injunction . . . have been fully and irrevocably

10  carried out."). Here, granting a mandatory preliminary injunction requiring Defendants to

11  provide Norsworthy with surgery would, absent a stay, apparently dispose of the entire case,

12  without a final judgment from this Court that Norsworthy is in fact entitled to the permanent

13  relief she seeks or any opportunity to seek appropriate review of that judgment on appeal.

14

15  **V.    THE PUBLIC INTEREST DOES NOT FAVOR AN ORDER DIRECTING PRISON OFFICIALS TO PROVIDE TREATMENT THAT IS NOT MEDICALLY NECESSARY.**

16       The public interest weighs against Norsworthy's requested relief. Initially, prison medical

17  staff have determined that sex reassignment surgery is not medically necessary for Norsworthy,

18  as evidenced by Board-certified psychologist, Dr. Coffin's well-reasoned and comprehensive

19  report. (Coffin Rep., ECF No. 66-1.) That decision is buttressed by the professional opinion of a

20  psychiatrist who specializes in gender disorders, Dr. Levine. (Coffin Rep., ECF No. 66-1; Levine

21  Report.)

22       Fundamentally, Norsworthy's request seeks to short-circuit the prison's internal processes

23  for medical treatment, and impose her preferred treatment over those that prison medical

24  professionals have deemed medically necessary in her case. She asks the Court to disregard the

25  reasoned opinion of medical and mental health professionals most familiar with her care. In such

26  situations, the public interest weighs against the relief she requests—"granting this injunctive

27  relief, which would effectively have the federal courts making *ad hoc*, and individual, decisions

28  concerning the treatment of a single prisoner, could harm both the defendants' and the public's

1   interest. In this prison context, the defendants' interests, and the public's interest in penological

2   order could be adversely [a]ffected if the Court began dictating the treatment for the plaintiff, one

3   inmate out of thousands in the state prison system." *Kelly v. Merrill*, No. 14-cv-2322, 2014 WL

4   7740025, at *9 (M.D. Pa. Dec. 11, 2014); *Wylie v. Montana Women's Prison*, 2014 WL 6685983,

5   at *3 (D. Mont. Nov. 25, 2014) (rejecting inmate's request for injunctive relief, and noting that "it

6   would not be in the public's interest to interfere with . . . prison policies").

7          Further, Norsworthy's request for immediate surgery takes no account of the administrative

8   and security issues that will ensue when Defendants attempt to safely incarcerate Norsworthy

9   following that surgery. "When evaluating medical care and deliberate indifference, security

10  considerations inherent in the functioning of a penological institution must be given significant

11  weight." *Kosilek v. Spencer,* 774 F.3d at 83. Here, similar to *Kosilek*, CDCR is concerned that

12  attempting to provide Norsworthy with safe housing options were she to undergo sex

13  reassignment surgery would present significant new safety and administrative concerns.

14  (Harrington Decl. ¶¶ 6-8.) Housing Norsworthy as an anatomically female inmate in an all-male

15  facility would pose unacceptable safety and security risks. (*Id.* ¶ 6.) On the other hand,

16  Norsworthy's post-sentencing probation report shows that before committing the murder that

17  resulted in her life sentence, she threatened her then girlfriend with bodily harm, and was arrested

18  under California Penal Code section 148.1 for threatening to bomb her girlfriend's home. (*Id.* ¶

19  4.) That history raises significant concerns about transferring Norsworthy to a female institution.

20  (*Id.* ¶ 7.) And as a patient in CDCR's Mental Health Services Delivery System, Norsworthy

21  cannot be housed at length in administrative segregation or a Security Housing Unit. (*Id.* ¶ 8; *see*

22  *also* Order (ECF 5131) at 46-55, *Coleman v. Brown,* No. 2:90-cv-00520 KJM-DAD (E.D. Cal.).

23  In short, after surgery CDCR may have no place in which to safely house Norsworthy without

24  significantly abridging her other constitutional rights. *Cf. Jones v. N.C. Prisoners' Labor Union*,

25  433 U.S. 199, 132-33 (1977).

26         Public interest in "penological order" mandates that Defendants be permitted to provide

27  medically necessary treatment under gender-neutral regulations. The public's interest in orderly

28  prison administration dictates that Norsworthy's motion should be denied.

28

## VI.   NORSWORTHY HAS NOT SHOWN THAT HER REQUESTED RELIEF MEETS THE PLRA'S STRINGENT NEED-NARROWNESS-INTRUSIVENESS TEST.

Lastly, because this is a prison conditions case, the Prison Litigation Reform Act imposes strict requirements on injunctive relief.  18 U.S.C. § 3626.  "The PLRA establishes standards for the entry and termination of prospective relief in civil actions challenging conditions at prison facilities."  *Miller v. French*, 530 U.S. 327, 333 (2000); *Gilmore v. California*, 220 F.3d 987, 998 (9th Cir. 2000).  Under this standard, any preliminary injunctive relief must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2).

Norsworthy's sole argument is that the PLRA purportedly did not "substantially change" the standards for granting injunctive relief.  (Pl.'s Mot. at 28.)  But she does not explain how her request for sex reassignment surgery and other, unspecified "adequate medical care" meets the need-narrowness-intrusiveness requirements.  As noted above, Norsworthy has not shown that the medical and mental health care she has received is deficient.  To the extent the Court disagrees, then any deficiency should be followed by a narrowly tailored remedy—for example, if the Court determines that Norsworthy should have received a special referral, then the appropriate remedy is not sex reassignment surgery, but instead a referral to an outside specialist (assuming the other elements of the PLRA are met).  Likewise, the proper remedy for an equal protection violation under the law and the PLRA would be to provide Norsworthy equal protection, i.e. equal access to medical treatment, not to order that she immediately undergo the surgery she now demands.

/ / /

/ / /

/ / /

**CONCLUSION**

For these reasons, the Court should deny Norsworthy's request for a mandatory preliminary injunction.

Dated:  March 12, 2015                                  Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
Supervising Deputy Attorney General
JOSE ZELIDON-ZEPEDA
Deputy Attorney General


*/s/ Preeti K. Bajwa*
PREETI K. BAJWA
Deputy Attorney General
*Attorneys for Defendants J. Beard, M.
Spearman, R. Coffin, J. Lozano, A. Adams,
A. Newton, D. Van Leer, and L. Zamora*

SF2014409242

30