UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHELLE-LAEL B. NORSWORTHY,

Plaintiff,

v.

JEFFREY BEARD, et al.,

Defendants.

Case No. 14-cv-00695-JST

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION, GRANTING REQUEST FOR JUDICIAL NOTICE, AND DENYING MOTION TO STRIKE**

Re: ECF Nos. 62, 77, 80

Before the Court are Plaintiff Michelle-Lael B. Norsworthy's Motion for a Preliminary Injunction, ECF No. 62, Defendants' Request for Judicial Notice, ECF No. 77, and Plaintiff's Evidentiary Objection and Motion to Strike Portions of Expert Declaration of Dr. Stephen Levine in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, ECF No. 80. For the reasons set forth below, the Court will grant Plaintiff's motion for a preliminary injunction, grant Defendants' request for judicial notice, and deny Plaintiff's evidentiary objection and motion to strike.

## I. BACKGROUND

### A. Norsworthy's Gender Dysphoria

Plaintiff, a California Department of Corrections and Rehabilitation ("CDCR") inmate currently incarcerated at Mule Creek State Prison in Ione, California, is a transsexual woman – a person whose female gender identity is different from the male gender assigned to her at birth. Deposition of Michelle-Lael Norsworthy ("Norsworthy Dep."), ECF No. 66-4 at 5, 18-20; Mental Health Evaluation: Gender Identity Disorder Evaluation of Dr. Raymond J. Coffin ("Coffin Eval."), ECF No. 66-1 at 4. Norsworthy was convicted of murder in the second degree with the

use of a firearm on April 15, 1987, and is serving a sentence of seventeen years to life in prison. Coffin Eval. at 3. She has been eligible for parole since March 28, 1998. Comprehensive Risk Assessment for the Board of Parole Hearings ("2014 Risk Assessment"), ECF No. 67 at 1.

Norsworthy experienced early confusion about her gender identity that continued into adulthood. Coffin Eval. at 4-5; Norsworthy Dep. at 42. She began openly identifying as a transsexual woman in the mid-1990's, and was diagnosed with gender identity disorder, now known as gender dysphoria, in January 2000.[1] Coffin Eval. at 4-6; Norsworthy Dep. at 42. Gender dysphoria is "a serious medical condition codified in the International Classification of Diseases (10th revision; World Health Organization) and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders – 5th edition (DSM-V)." Declaration of Dr. Randi C. Ettner ("Ettner Decl."), ECF No. 63 ¶ 16. It is "characterized by an incongruence between one's experienced/expressed gender and assigned sex at birth, and clinically significant distress or impairment of functioning as a result." Id. The condition is associated with "severe and unremitting emotional pain." Id. Without treatment, people with gender dysphoria experience anxiety, depression, suicidality, and other mental health issues. Id. ¶ 18. Male-to-female transsexuals without access to appropriate care may resort to attempting auto-castration in order to alleviate their distress. Id. ¶ 19. Gender dysphoria intensifies with age. Id. ¶ 20.

Norsworthy explains that she is "a woman trapped in a man's body" and that "[her spirit] is imprisoned in a way that causes excruciating pain and frustration to a point that therapy and other remedies are the only way to relieve that [] agony." Norsworthy Dep. at 20, 133. The "psychological and emotional pain" and "frustration and agony" she experiences mean that she is "unable [] to complete [her] existence or complete who [she is]." Id. at 21. At times, the anxiety caused by her gender dysphoria causes symptoms such as sleeplessness, cold sweats, hypervigilance, panic attacks, and mood swings. Id. at 87-88; Ettner Decl. ¶ 69 (describing "severe" anxiety symptoms consistent with a gender dysphoria diagnosis, including "feeling discomfort in abdomen, feeling hot, heart pounding, feeling faint, and fear of 'the worst

---

[1] This order will generally use the current term "gender dysphoria," even when referring to earlier treatment and diagnoses.

happening'").

**B.      WPATH Standards of Care**

The World Professional Association for Transgender Health ("WPATH") has developed Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People ("Standards of Care"), which are recognized as authoritative standards of care by the American Medical Association, the American Psychiatric Association, and the American Psychological Association. Ettner Decl. ¶ 21; see also Deposition of Lori Kohler, M.D. ("Kohler Dep."), ECF No. 67 at 21, at 91-92. The Standards of Care explain that treatment for gender dysphoria is individualized: "What helps one person alleviate gender dysphoria might be very different from what helps another person." Standards of Care, Version 7, ECF No. 10-1 at 5. They address a variety of therapeutic options, including changes in gender expression and role, hormone therapy, surgery, and psychotherapy. Id. at 8.

One treatment for gender dysphoria is sex reassignment surgery ("SRS"). "Vaginoplasty is the definitive male-to-female sex reassignment surgery." Declaration of Dr. Marci L. Bowers ("Bowers Decl."), ECF No. 65 ¶ 15. It involves the removal of the patient's male genitals and creation of female genitals, and has two therapeutic purposes. Id. ¶ 19; Ettner Decl. ¶ 39. SRS for transsexual female patients both removes the principal source of testosterone in the body and creates congruence between the patient's gender identity and her primary sex characteristics. Ettner Decl. ¶¶ 38-39. The Standards of Care explain:

> While many transsexual, transgender, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria. For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity.

Standards of Care at 36; see also Ettner Decl. ¶ 38 ("For many individuals with severe gender dysphoria, however, hormone therapy alone is insufficient. Relief from their dysphoria cannot be achieved without surgical intervention to modify primary sex characteristics, i.e. genital reconstruction."); Bowers Decl. ¶ 31 ("Although some transgender people are able to effectively

3

treat their gender dysphoria through other treatments, sex reassignment surgery for many people is a medically necessary treatment needed to treat gender dysphoria and establish congruence with one's gender identity."). Studies have shown that SRS is a safe and effective treatment for individuals with gender dysphoria. See Standards of Care at 36 ("Follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes."); Ettner Decl. ¶ 40 ("Decades of careful and methodologically sound scientific research have demonstrated that sex reassignment surgery is a safe and effective treatment for severe gender dsyphoria and, indeed, for many people, it is the only effective treatment."); Bowers Decl. ¶ 28 ("The vast majority of studies have shown that sex reassignment surgery is clinically effective. In my professional experience, the success rate of vaginoplasty is extremely high."); Defendants' Expert Report ("Levine Report"), ECF No. 72-4, at 6-7 (acknowledging that "SRS is not thought to be experimental now that it has been repeatedly positively evaluated for over twenty years").

The Standards of Care set forth six eligibility criteria for vaginoplasty in male-to-female patients:

> (1) Persistent, well-documented gender dysphoria;
> (2) Capacity to make a fully informed decision and to consent for treatment;
> (3) Age of majority in a given country;
> (4) If significant medical or mental health concerns are present, they must be well controlled;
> (5) 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual);
> (6) 12 continuous months of living in a gender role that is congruent with the patient's identity.

Standards of Care at 39. They also require two referrals from qualified mental health professionals who have independently evaluated the patient. Id. at 19-20. "If the first referral is from the patient's psychotherapist, the second referral should be from a person who has only had an evaluative role with the patient." Id. at 20.

The standards "in their entirety apply to all transsexual, transgender, and gender-nonconforming people, irrespective of their housing situation." Id. at 43. They expressly provide that "[p]eople should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons." Id. The Standards

4

allow for "[r]easonable accommodations to the institutional environment," such as the use of injectable hormones where diversion of oral prescriptions is highly likely, but they make clear that "[d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the [Standards of Care]." Id. at 44.

###    C.    Norsworthy's Treatment

Norsworthy indicated to prison staff that she sought hormone treatment and eventual SRS as early as 1996. Coffin Eval. at 4; 2014 Risk Assessment at 5. She self-referred to the Gender Clinic at California Medical Facility ("CMF") in 1999. Id. at 5. After a comprehensive psychological evaluation, Norsworthy was diagnosed with gender identity disorder by Dr. C.R. Viesti in January 2000. Id. at 6; ECF No. 68 at 17. Later that month, she began hormone therapy under the supervision of Dr. Lori Kohler. Coffin Eval. at 6. This treatment has continued, with periodic dose adjustments and one interruption, discussed below, through the present time. Id.; Declaration of Dr. I. Munir ("Munir Decl."), ECF No. 74 ¶ 2. As a result of her hormone therapy, Norsworthy has become a "biological female," "a pleasant looking woman, slender and coiffed in a pony tail," who "walk[s] the yard . . . as a woman." ECF No. 68 at 24, 26; see also Ettner Decl. ¶ 73 ("As a result of long-term hormonal usage, she is now *hormonally reassigned.*"). Norsworthy has been permitted to keep her hair long, to shower out of the sight of other inmates, and to purchase and possess brassieres, with a "few lapses," but prison officials often refer to her using her legal name, Jeffrey Norsworthy. ECF No. 68 at 32; Coffin Eval. at 6; Levine Report at 22; Norsworthy Dep. at 25, 136-39. She is currently housed in a sensitive needs yard. Declaration of Kelly Harrington ("Harrington Decl."), ECF No. 75 ¶ 5.

Norsworthy's treatment for gender dysphoria has included psychotherapy, which began following her diagnosis in 2000. Coffin Eval. at 8. She also began psychological treatment for symptoms of posttraumatic stress disorder ("PTSD") after she was gang raped by a group of inmates in March 2009. Id. She is currently under the care of a psychologist, Dr. Landry. Norsworthy Dep. at 125. At times when she does not receive mental health treatment, Norsworthy actively seeks out therapy. Levine Report at 17.

1    Despite these many years of hormone therapy and counseling, Norsworthy continues to

2    experience "excruciating pain and frustration" as a result of her gender dysphoria.  Norsworthy

3    Dep. at 20.  Her medical records reflect a consistent diagnosis of gender dysphoria, as well as

4    Norsworthy's continuous desire to obtain SRS.  See, e.g., ECF No. 68 at 20 (March 19, 2012), 30

5    (April 28, 2009); ECF No. 70 at 1 (referencing Norsworthy's statements to endocrinologists since

6    December 2011); see also Norsworthy Dep. at 157 (estimating that she made oral requests for SRS

7    to almost all of her therapists).  One progress note from April 2009 indicates that Norsworthy

8    experiences ongoing emotional struggles, "possibly more pronounced by not being able to

9    complete the required surgeries."  ECF No. 68 at 30.  In November 2012, her treating

10   psychologist, Dr. W. Reese, determined that "clinical medical necessity suggest and mandate a sex

11   change medical operation before normal mental health can be achieved for this female patient."

12   ECF No. 68 at 13.  He determined that SRS was a "clinical and medical necessity for her health

13   and well-being."  Id. at 14.

14   According to Dr. Gorton, a physician with expertise in the treatment of transgender

15   patients, Norsworthy has several medical risk factors that make the long-term use of the high

16   dosages of hormone therapy needed for preoperative female transgender patients more dangerous.

17   Declaration of Dr. R. Nick Gorton ("Gorton Decl."), ECF No. 64 ¶¶ 3, 19-20.  First, the risks of

18   heart attack, stroke, deep venous thrombosis, pulmonary emboli, breast cancer, liver toxicity, and

19   development of pituitary tumors generally increase for older patients.  Id. ¶ 19.  Norsworthy is

20   fifty-one years old.  Coffin Eval. at 1.  Second, Norsworthy was diagnosed with hepatitis C after

21   being raped in 2009, and has ongoing liver damage as a result.  Gorton Decl. ¶ 17.  Such liver

22   damage can be exacerbated by hormone replacement therapy, particularly the oral estrogens that

23   CDCR has provided.  Id. ¶ 20.  Third, Norsworthy is allergic to spironolactone, the most common

24   anti-androgen used in the treatment of transgender women in the United States.  Id.  The

25   alternative treatment she receives can increase risk for breast cancer, heart disease, and liver

26   toxicity.  Id.

27   In or around August 2014, Norsworthy's endocrinologist completely discontinued her

28   hormonal treatments because of concerns about her liver function tests.  Id. ¶ 22.  Contrary to his

recommendation, CDCR denied her access to an alternative medication to treat her gender dysphoria. Id. ¶ 23. According to Dr. Gorton, this complete removal from hormone therapy put Norsworthy at risk for significant worsening of her gender dysphoria. Id. ¶ 24. Norsworthy was permitted to resume hormone therapy at lower doses in or around November 2014, but she is receiving a "last resort" oral medication, rather than the recommended transdermal or injected preparations, which would reduce her risk of liver toxicity. Id. ¶¶ 26-27; see also Munir Decl. ¶ 4. As Norsworthy's liver condition becomes more serious, she is at increased risk of being completely removed from hormone therapy again, which would increase her dysphoria and might result in serious depression, suicidal ideation, or self-harm. Gorton Decl. ¶ 28. If Norsworthy received SRS, her risk would decrease because the removal of her testosterone-producing male genitalia would reduce the need for the hormones that threaten her health. Id. ¶ 37.

### D. Norsworthy's Appeal Seeking SRS

Norsworthy discussed her need for SRS with her treating mental health providers beginning in 2000. Norsworthy Dep. at 156-57. It was not until she heard about the decision in Kosilek v. Spencer, 889 F. Supp. 2d 190 (D. Mass. 2012), aff'd, 740 F.3d 733 (1st Cir. 2014), rev'd en banc, 774 F.3d 63 (1st Cir. 2014), however, that she believed that she might have an opportunity to receive SRS. In Kosilek, which was later reversed by the First Circuit, sitting en banc, the district court granted an injunction requiring the Massachusetts Department of Corrections to provide SRS to Michelle Kosilek, an inmate suffering from severe gender dysphoria. 880 F. Supp. 2d at 251. Norsworthy explains that she filed her first formal request for SRS in September 2012, less than two weeks after the Kosilek decision was released, "because it was the first time that an opportunity was provided to transgenders that said the State had to listen to me." Norsworthy Dep. at 160. Before that, she viewed any formal request for SRS as "absurd" and "like ramming your head into a wall," because she understood that it would be "continually denied." Id.

On September 16, 2012, Norsworthy, who was then housed at CDCR's Correctional Training Facility ("CTF"), submitted a Patient/Inmate Health Care Appeal, seeking "adequate and sufficient medical care" for her gender dysphoria, including SRS. ECF No. 68 at 4-6. At the first

level of her appeal, registered nurse L. Fernandez interviewed Norsworthy and created a report, which Defendant Alexandra Newton, a supervising registered nurse, approved. ECF No. 68 at 4, 8-9; Deposition of Alexandra Newton ("Newton Dep."), ECF No. 69at 6, at 34. The report states that Norsworthy indicated that she was "feeling miserable of not being able to fully express [her]self," that she had "a serious medical need which only [SRS] can correct," and that she was "requesting the medically necessary sex reassignment surgery to alleviate pain and suffering." ECF No. 68 at 8. She was counseled to "discuss this matter with your PCP primary care provider" in six months, and her request for SRS was "[d]enied per state policy." Id. Although Kohler, a transgender specialist, was working at CTF at the time, neither Newton nor Fernandez contacted her for assistance in reviewing the appeal. Newton Dep. at 61; Kohler Dep. At 134-36, 143.

At the second level, the appeal was assigned to Defendant Dr. Anise Adams, the Chief Medical Executive at CTF. ECF No. 68 at 10-11; Deposition of Dr. Anise Adams ("Adams Dep."), ECF No. 69 at 30, at 24. Before rendering her decision on November 27, 2012, Adams contacted CDCR legal staff "[b]ecause [she] knew it was an area of legal interest." Adams Dep. at 128. In her decision, Adams stated, "There is no blanket policy in the CDCR that prohibits Sexual Reassignment Surgery (SRS)," but denied Norsworthy's appeal because "Over the past year and a half, neither your mental health nor your [primary care provider] has recommended SRS as treatment." ECF No. 68 at 11. She concluded that Norsworthy's treatment plan was "working well to control [her] symptoms." Id.

Two days after Adams' decision, Norsworthy's treating psychologist issued an explicit recommendation that she receive SRS as a "clinical and medical necessity." ECF No. 68 at 13-14. He then reaffirmed this view over the next few months. See, e.g., ECF No. 68 at 71 (December 13, 2012: "[Norsworthy] needs to complete her sex change operation (male to female) so that she can achieve physical, mental and emotional well-being"); 64 (March 28, 2013: "Note that [inmate/patient's] mental health and well being are dependent on moving forward with this sex-change operation"); 57 (April 18, 2013: "Recommend completion of the sex-change process, and validate that [inmate/patient] Norsworthy is both psychological [sic] cleared and psychologically and emotionally, and cognitively [sic] to complete this sex change operation"); 56 (April 25, 2013:

8

"As [inmate/patient] has been psychologically cleared, by psychiatry and primary clinicians trained in the trans-sexual process.; [inmate/patient] should complete this process in a timely manner. . . . In my opinion, health, safety, fairness and justice mandate the above recommendation be done.").

Sometime before June 10, 2013, Norsworthy was removed from Reese's care after seeing him once per week for approximately two years. ECF No. 69 at 2. Norsworthy's medical records describe this as a "quick, unexpected change of primary clinicians due to a HQs directive." ECF No. 69 at 2. Norsworthy testified that Reese explained to her that she "was being removed from his caseload because [she] had filed the appeal." Norsworthy Dep. at 124. Reese told her that "his supervisor had called and that someone from Sacramento had called and suggested" that she be placed on another doctor's caseload. Id. Norsworthy describes her relationships with her new therapists as "superficial." Id. at 124-26. She currently sees a psychologist named Dr. Landry, who "just deals with the basics," such as making sure that she has no suicidal or homicidal ideation, and sees her every ninety days. Id.

The third level appeal was initially reviewed on May 22, 2013, by a physician, Dr. T. S. Robinson, who recommended that a mental health consultant review the case. ECF No. 69 at 69; ECF No. 70 at 1. Dr. Cornish, the mental health consultant, concluded that "the progress notes indicate that the [inmate] is psychologically ready for the SRS," but noted, "I do not know if CDCR is performing SRS," and "I will defer to medical for the final decision on this appeal." ECF No. 70 at 4. CDCR then requested that Defendant Dr. Raymond J. Coffin, a psychologist, conduct an evaluation in connection with Norsworthy's appeal. Coffin Eval. at 1; Deposition of Raymond John Coffin, Psy.D. ("Coffin Dep."), ECF No. 70 at 5, at 103.

Coffin testified that this was the first time he had been asked to conduct an independent evaluation in connection with a third level appeal, and that he understood that he had been selected because CDCR "wanted someone that had been through Dr. [Stephen] Levine's training." Coffin Dep. at 108, 120. Dr. Levine's one-day training on "Assessment and Treatment of Gender Identity Disorder Persons," held in April 2012, clearly instructed participants that SRS was never an available treatment for incarcerated patients. ECF No. 71 at 2, 44 (an inmate receiving

hormonal treatment must understand "that this will not lead to SRS in prison"), 45 (reasons to reject inmates' requests for SRS include "[s]ocial conditions of prison, limited life opportunities for prisoners, security concerns, sociopathy embedded into criminal careers, the arbitrary declarations in [the Standards of Care], the bizarreness of the opinions of outside experts about prison's [sic] right to SRS, rhinoplasty, and the inability to assess the patient in the context of a full life"), 46 ("[s]urgical candidates may use experience to decide to have surgery when they are released").

Coffin interviewed Norsworthy on July 1, 2013, and, after consultation with the legal department, completed his evaluation on October 10, 2013. Coffin Eval. at 1, 21; Coffin Dep. at 111-12. Coffin's detailed report reviewed Norsworthy's personal, medical, and mental health history, and concluded that this history appeared to confirm the accuracy of the gender dysphoria diagnosis. Coffin Eval. at 17. However, he omitted discussion of Norsworthy's disgust with her male genitalia, anxiety, depression, and suicidal ideation – important indicators of medical necessity that Norsworthy discussed in her interview with him. Coffin Dep. at 124-26. Coffin stated that he found no evidence on the record that Norsworthy's gender and endocrinology specialists had made specific recommendations regarding SRS, and that although Reese had recommended SRS, he had not directly addressed the issue of medical necessity. Coffin Eval. at 12, 18. Coffin concluded that Norsworthy "appears to have developed sufficient resilience to maintain a stable mood," and that "[w]hile it appears likely that [her] medical consultants would approve [her] as a candidate for SRS as an *elective* procedure, . . . the available documentation does not establish SRS as medically necessary at this time." Id. at 18-19. Coffin also expressed concern that Norsworthy's decision regarding SRS might change after release, and that "the time, energy, and attention required to successfully undergo and recover from such surgery . . . very possibly could undermine [inmate/patient] Norsworthy's efforts to . . . obtain[] [her] release from prison." Id. at 19-20.

On October 25, 2013, after consulting with the legal department, Defendant Lori Zamora issued her decision denying Norsworthy's appeal at the third level of review. ECF No. 68 at 2-3; ECF No. 71 at 94. The decision stated, "Your current providers have documented the

determination that the subject surgery is not medically necessary for you. Your appeal of that determination does not include a showing that the subject surgery is medically necessary for you." ECF No. 68 at 3. At her deposition, Zamora defined a "current provider" as "anybody who is involved in the current care of that inmate," but was unable to identify any support for the statement that Norsworthy's providers had concluded that SRS was not medically necessary. Deposition of Lori Zamora ("Zamora Dep."), ECF No. 71 at 52, at 88-91. Zamora did not consult any specialists in the treatment of gender dysphoria or educate herself on the prevailing standards of care before making her decision. Id. at 96-97. Zamora's decision exhausted Norsworthy's administrative remedies. ECF No. 68 at 2.

On October 22, 2014, after this litigation began and on the advice of her attorney, Norsworthy also submitted a "Health Care Services Request Form," CDCR Form 7362, requesting SRS. Norsworthy Dep. at 106-07; ECF No. 76-3 at 10-11. She was referred to her primary care provider. Id.

E.      **CDCR Policies Regarding SRS**

Under CDCR regulations, vaginoplasty, except for cystocele or rectocele (conditions affecting cisgender women), is a surgery that is "not medically necessary" and "shall not be provided." 15 C.C.R. § 3350.1(b). The regulations create an exception where "[t]he inmate's attending physician [] prescribes the treatment as clinically necessary" and "[t]he service is approved by . . . the Institutional Utilization Management committee and the Headquarters Utilization Management committee." Id. § 3350.1(d). In their testimony, Defendants were unable to explain the application of Section 3350.1 to an inmate's request for SRS as a treatment for gender dysphoria. Zamora Dep. at 149 ("I don't know that we even looked at this"); Newton Dep. at 86 ("All I know is that our procedures, as far as I know, would have to follow that pathway generated by the primary care provider"); Coffin Dep. at 180 ("With regard to prescribing the treatment, it's not clear from the policy, in my opinion, how the term [attending physician] is being used with regard to mental health."); Adams Dep. at 101-103 ("This section is more along the lines of referrals by providers, not necessarily by inmates as far as a 602 [appeal].").

The CDCR's Department Operations Manual ("DOM") provides that "Implementation of

surgical castration, vaginoplasty, or other such procedures shall be deferred beyond the period of incarceration.  Surgical procedure shall not be the responsibility of the Department."  ECF No. 71 at 115.  Defendants testified that they are required to follow DOM policies.  Adams Dep. at 95; Newton Dep. at 78.  The DOM position was reaffirmed in Levine's CDCR training on the assessment and treatment of incarcerated patients with gender dysphoria, as discussed above.  See ECF No. 71 at 44-46.  Kohler, who ran the CDCR gender clinic at CMF from 1998-2010 and a telemedicine clinic for patients in other facilities from 2007-2010, also testified that, based on discussions with the chief medical officer at CMF and with legal counsel for CDCR, she understood that SRS was "not part of what the State was willing to provide."  Kohler Dep. at 33-34, 41.  Although she testified that she was not aware of a written policy barring SRS, she explained that her request that SRS be included in the treatments available to transgender inmates was denied, and that she understood that SRS would not be available to them.  Id. at 45, 57-58.  She explained, "It was just an understanding.  It was more like don't even think about it.  More of just not available."  Id. at 45.  Of her 500-600 patients, between 60 and 70 percent inquired about the availability of SRS.  Id. at 35, 37.  None received it.  Id. at 36.  Kohler also testified that it is still her understanding that hormone therapy and mental health treatment are the only currently available treatments for incarcerated patients.  Id. at 63-64.  Norsworthy testified that her providers had indicated to her that CDCR had a policy of not providing SRS to transgender inmates.  Norsworthy Dep. at 154-55.

**F.      Expert Reports**

In connection with this litigation, the parties have consulted various experts in the treatment of individuals with gender dysphoria.

**1.      Dr. Randi Ettner**

Dr. Randi Ettner, an expert retained by Norsworthy, is a psychologist with extensive experience and expertise in the treatment of patients with gender dysphoria.  Ettner Decl. ¶¶ 2-8.  She has evaluated and/or treated between 2,500 and 3,000 individuals with gender dysphoria and mental health issues related to gender variance over a period of over thirty-five years, and is a member of the Board of Directors of the WPATH and an author of the WPATH Standards of

Care. Id. Her declaration is based upon review of Norsworthy's medical records, Norsworthy's deposition testimony, Coffin's evaluation, and an in-person interview. Id. ¶¶ 12-15. Ettner concludes:

> Despite fourteen years of feminizing hormone therapy and counseling, Ms. Norsworthy continues to suffer from gender dysphoria and attendant anxiety. . . . Clearly, after years of counseling and hormone therapy, Ms. Norsworthy now requires genital surgery. i.e., the reconstruction of primary sex characteristics. Were Ms. Norsworthy to undergo this surgical procedure, all symptoms would be attenuated or eliminated.

Id. ¶¶ 75-76. Ettner concludes that Norsworthy exceeds the WPATH criteria for surgery, and that "[o]wing to the severity of gender dysphoria and resultant clinically significant distress, and its persistence despite years of hormone therapy and counseling, reassignment surgery is the necessary intervention for Ms. Norsworthy, and should be immediately implemented." Id. ¶¶ 78-79. Ettner notes that although Norsworthy "currently denies suicidal ideation, she is presently optimistic that she will receive surgery as a result of this lawsuit," and without this "medically necessary surgical intervention," she is "at risk for emotional destabilization, which may result in renewed suicide attempts given Ms. Norsworthy's past suicide attempts and family history." Id. ¶¶ 83-84; see also id. ¶¶ 55, 63 (explaining that Norsworthy's biological father committed suicide in 1976 and that she has a history of suicidal ideation and two suicide attempts").

Ettner also opines that Coffin's evaluation and deposition testimony "reveal[] a profound misunderstanding of, and lack of scientific information regarding, the nature, assessment, and treatment of gender dysphoria." Id. ¶ 86. She critiques Coffin's use of male pronouns to refer to a female gender dysphoric patient; his suggestion that gender dysphoria is an "alternate lifestyle" or a developmental "disruption"; his conflation of sexual orientation and gender identity; and his lack of familiarity with the Standards of Care and relevant research. Id. ¶¶ 87-94. She expresses particular concern about Coffin's opinion that self-mutilation, suicidality, and severe mental illness are indicators that SRS is medically necessary, which is contrary to the Standards of Care requirements that significant medical and mental health conditions must be well-controlled and a patient must be capable of giving informed consent before a patient receives SRS. Id. ¶¶ 91-92;

see Coffin Dep. at 40-41.  Finally, she rejects Coffin's suggestion that Norsworthy is not able to make an informed decision about SRS until she has the opportunity to live as a woman outside of prison.  Ettner Decl. ¶ 93.  To the contrary, she explains that patients must engage in twelve continuous months of living in their affirmed gender role, whether or not they are institutionalized: "Patients do not 'decide' they have a male gender identity in one 'community' and a female gender identity in another."  Id.

### 2.  Dr. R. Nick Gorton

Dr. R. Nick Gorton, an expert retained by Norsworthy, is a physician with expertise in the treatment of transgender patients.  Gorton Decl. ¶¶ 1, 3.  He has provided primary care and transgender-related care to over 200 transgender patients, including medical assessments, initiation and monitoring of hormonal treatment, and determinations of whether and when patients meet the criteria for SRS.  Id. ¶ 4.  His declaration is based on review of Norsworthy's medical records and deposition testimony, as well as Coffin's evaluation.  Id. ¶¶ 12-14.  He states:

> [B]ased on my review of Ms. Norsworthy's records and, in particular, the recommendation from her treating mental health provider that sex reassignment surgery was medically necessary, sex reassignment should have been performed years ago as a medically necessary treatment for the distress Ms. Norsworthy experiences from her gender dysphoria.  She meets the criteria established by the WPATH Standards of Care for sex reassignment surgery as a medically necessary treatment and the delay in providing surgery has subjected and continues to subject Ms. Norsworthy to significant and unnecessary pain.

Id. ¶ 29.  Gorton disagrees with Coffin's conclusions.  Id. ¶ 30.  He explains that "[s]evere mental health dysfunction is not necessary to refer patients for medically necessary sex reassignment surgery, and, in fact, a current severe mental impairment is a contraindication for sex reassignment surgery."  Id. ¶ 31.  He notes that because of Norsworthy's hepatitis C, she "continues to receive ineffective hormone therapy that likely will result in continued damage to her liver and a continuous cycle of going on and off the hormone treatments, resulting in unnecessary damage to her liver and continually placing her at risk of worsening dysphoria."  Id. ¶ 35.  Worsening dysphoria puts patients at risk of depression, self-harm (including auto-castration), and suicide.  Id. ¶ 36.  Accordingly, Gorton recommends "[i]mmediate, urgent referral for genital sex

14

reassignment surgery." <u>Id.</u> ¶ 38.

### 3. Dr. Stephen Levine

Dr. Stephen Levine, an expert retained by Defendants, is a psychiatrist who has testified as an expert in three cases involving inmates' requests for SRS. Levine Report at 1. His opinion is based on his review of Norsworthy's First Amended Complaint ("FAC"), ECF No. 10, Coffin's report, and some of Norsworthy's mental health and other records, as well as an in-person interview. Levine Report at 2, 12. Levine provided opinions concerning the provision of SRS to incarcerated people in general, and to Norsworthy in particular.

With respect to SRS for institutionalized people in general, Levine opines that the "Standards of Care assert that a real life experience living in society as a woman should be done for at one year [sic] prior to SRS," but inmates "have no comparable opportunity to live in free society." <u>Id.</u> at 6. He states, "I know of only one inmate in the US who has had SRS while in custody. This California inmate's mental health dramatically deteriorated." <u>Id.</u> Defendants have conceded, however, that the incident Levine describes could not have occurred, because "NO vaginoplastys have ever been performed on any inmate incarcerated in CDCR." ECF No. 80-2 at 31 (emphasis in original). Perhaps on the same factual basis, Levine further cautions that rather than alleviating pain for incarcerated patients, SRS may in fact "induce a different types [sic] of pain" because "[i]t risks taking away a long term incarcerated inmate's life purpose, quest, hope for the future, and reason to live." Levine Report at 8. Levine states that long-term gender dysphoria is "not the same meaning as severe pain," and "is not comparable to physical pain." <u>Id.</u> at 11, 22. He suggests that "[l]egal advocates exaggerate the suffering of gender dysphoria through a misunderstanding of its nature." <u>Id.</u> at 11. Finally, in his view, "SRS is always an elective procedure. There is no immediacy to it." <u>Id.</u> at 25.

With respect to Norsworthy, Levine acknowledges that Reese's recommendations "can be read as meaning that a qualified mental health professional has made a judgment." <u>Id.</u> at 10. He also agrees that Norsworthy's "gender identity was consolidated as feminine and is likely to remain so within or outside of prison because by now it has little to do with genitalia or breast size or clothing and everything to do with her self-concept." <u>Id.</u> at 15. He states that "SRS would

diminish her gender dysphoria," and "might also benefit Michelle by enabling her to further solidify her already strong female identity." Id. at 22. He concludes that all of the WPATH eligibility criteria have been met, except that "[s]he does not have any time, let alone 12 months, of continuous living in the female gender role in society," and "[s]he does not have two separate mental health professionals [sic] letters of recommendation based upon independent evaluations." Id. at 24. He expresses that, after release, "she may be able to get two recommendations" based on her years of hormone therapy, her persistent female gender identity, and her desire for SRS. Id. He does not address the WPATH Standards of Care's clear guidance that custodial status is irrelevant to eligibility for SRS.

However, in Levine's opinion, Norsworthy's "existential distress does not constitute a necessity for immediate SRS." Id. at 22. He explains

> Not being granted immediate SRS will likely disappoint Michelle, usher in despair, temporarily overwhelm her with depression with some suicidal ideation and leave her confused about her future. When and if this ensues, she will be attended to by the corrections mental health staff who are experienced with disappointed despairing inmates.

Id. at 21. Levine also concludes that "[n]o treatment is indicated for her Hepatitis C" because "[t]he deterioration of her liver function has been reversed by lowering her estrogen intake to a reasonable dose," and "her liver disease [is not] a reason to perform SRS to give her enough estrogen to maintain her breast tissue." Id.

Levine opines that "SRS will not significantly improve Michelle's ability to function in prison," because she "is doing better today than ever before." Id. at 23. Transfer to a women's prison, on the other hand, would "test her capacity to relate to females." Id. In his view, "[n]ot having SRS would prevent a possible psychological decompensation, another rape, or a sexually transmitted disease." Id. at 10. Levine also warns that if Norsworthy were released, "her priorities will change." Id. at 25. He states, "Clinicians and lawyers alike need to consider that transition to femaleness is an adaptive response to long term incarceration. Once released, she may life [sic] her life differently." Id.

///

### G.     CDCR Safety Concerns

No CDCR inmate has ever received SRS while in custody.  Harrington Decl. ¶ 6.  As a result, CDCR has voiced "significant safety and security concerns" with the possibility of Norsworthy receiving SRS.  Id. ¶ 8.  Kelly Harrington, the Acting Director of the Division of Adult Institutions, cites concerns about arranging for Norsworthy's surgery, providing security during her hospitalization, and providing an appropriate location for post-operative recovery and placement.  Id.  ¶ 6.  Harrington explains that SRS would preclude Norsworthy from being housed in an all-male facility, but that Norsworthy would be "at significant risk of being assaulted or victimized by female offenders" in a women's facility because of her history of domestic violence against her girlfriend before her arrest.  Id. ¶¶ 4, 7-8.  Harrington is also concerned that "Norsworthy might herself victimize female inmates."  Id. ¶ 8.  She cites "numerous issues experienced in providing a stable housing environment with a male-to-female transgender person whose surgery took place before her arrival to CDCR."  Id. ¶ 6.  Finally, she explains that housing Norsworthy in administrative segregation would not be possible because her mental health classification precludes long-term placement in segregation for non-disciplinary reasons.  Id. ¶ 9.

### H.     Procedural History

Norsworthy initiated this action by filing a complaint under 42 U.S.C. § 1983 on February 14, 2014.  ECF No. 1.  On March 26, 2014, the Court dismissed her claims with leave to amend, ECF No. 4, and on April 2, 2014, the Court issued an Order Appointing Counsel, ECF No. 7.  On April 15, 2014, the Court dismissed a separate but related action, Norsworthy v. Beard, et al., No. 3:14-cv-00345-JST, concerning Norsworthy's request for a name change, without prejudice to Plaintiff reasserting the name change claims in her amended complaint in this action.  ECF No. 8 at 5.

Norsworthy filed her First Amended Complaint on July 2, 2014.  ECF No. 10.  She sues Defendants Adams, Beard, Coffin, Lozano, Newton, Spearman, Van Leer, Zamora, and Does 1-30 under 42 U.S.C. § 1983, seeking injunctive relief based on Defendant's failure to (1) provide her with medically necessary SRS and (2) allow her to pursue a legal name change.  FAC ¶ 1.  Norsworthy seeks injunctive relief (1) enjoining Defendants from interfering with the discretion of

1    the mental health and other medical professionals involved in her care; (2) declaring California

2    Code of Regulations, Title 15, Section 3350.1(b)(2) unconstitutional on its face and as applied;

3    (3) enjoining Defendants to provide her with adequate medical care, including SRS; and (4)

4    requiring Defendants to allow her to seek a legal name change. Id. ¶¶ 100-03. She also seeks

5    attorneys' fees and costs. Id. ¶ 104. On November 18, 2014, the Court granted Defendants'

6    motion to dismiss Norsworthy's Section 1983 claim based upon deprivation of her Eighth

7    Amendment rights resulting from Defendants' failure to allow her to pursue a legal name change,

8    and denied the motion to dismiss in all other respects. ECF No. 38.

9    Plaintiff now seeks a preliminary injunction that "Defendants shall provide Plaintiff with

10   access to adequate medical care, including sex reassignment surgery." ECF No. 62-1 at 1.[2]

11   Defendants oppose the motion. ECF No. 73.

12   **I.    Jurisdiction**

13   This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, because

14   her Section 1983 claims arise under federal law.

15   **II.    REQUEST FOR JUDICIAL NOTICE**

16   As a preliminary matter, the Court addresses Defendants' request that the Court take

17   judicial notice of (1) an authenticated copy of the Order Appointing Receiver, Plata et al. v.

18   Schwarzenegger et al., Case No. 01-cv-1351-TEH (N.D. Cal. Feb. 14, 2006); and (2) an

19   authenticated copy of the CDCR Regulatory File pertaining to revisions of the California Code of

20   Regulations, Title 15, Section 3350.1. ECF No. 77. Plaintiff has not opposed this request.

21   Under Federal Rule of Evidence 201(b), the Court may take judicial notice of facts that are

22   "not subject to reasonable dispute" because they "can be accurately and readily determined from

23   sources whose accuracy cannot reasonably be questioned." A court "must take judicial notice if a

24   party requests it and the court is supplied with the necessary information." Fed. R. Evid.

25   201(c)(2). A court may properly take notice of its own records in other cases, U.S. v. Wilson, 631

26

27   [2] Plaintiff's proposed order also requests that the Court "enjoin[] [Defendants] from applying the discriminatory policies of denying transgender inmates access to medically necessary sex reassignment surgery on the basis of their transgender status," but Plaintiff's motion does not

28   discuss this request, and this order does not address it.

F.2d 118, 119 (9th Cir. 1980), and of the official records of the CDCR, <u>Brown v. Valoff</u>, 422 F.3d 926, 931 n.7 (9th Cir. 2005). Accordingly, Defendants' request for judicial notice is granted.

## III.    EVIDENTIARY OBJECTION AND MOTION TO STRIKE

Plaintiff objects to portions of Levine's report and moves to strike them from the record. ECF No. 78-4. Specifically, she seeks an order striking (1) testimony regarding prison culture and the treatment of incarcerated patients; testimony regarding the effects of hormone therapy; (3) testimony regarding the qualifications of Dr. Coffin; and (4) testimony regarding Plaintiff's sexuality. <u>Id.</u>; <u>see also</u> ECF No. 78-5. Defendants oppose this request. ECF No. 88.

### A.    Legal Standard

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Trial courts serve a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152 (1999) (citing <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993)). They should screen "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." <u>City of Pomona v. SQM North America Corp.</u>, 750 F.3d 1036, 1044 (9th Cir. 2014). The <u>Daubert</u> test "is not the correctness of the expert's conclusions but the soundness of his methodology." <u>Id.</u> "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." <u>Primiano v. Cook</u>, 598 F.3d 558, 564 (9th Cir. 2010). The proponent of the expert testimony has the burden of proving admissibility. <u>Lust By & Through Lust v. Merrell Dow Pharms., Inc.</u>, 89 F.3d 594, 598 (9th Cir. 1996).

Federal Rule of Evidence 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

In considering a motion for a preliminary injunction, the Court may "give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984); see also Republic of the Phillippines v. Marcos, 862 F.2d 1355, 1363 (9th Cir. 1988).

**B.      Discussion**

**1.      Compliance with Rule 26**

As a preliminary matter, Plaintiff contends that Levine's report should be excluded for failure to comply with the requirements of Federal Rule of Civil Procedure 26. ECF No. 78-4 at 1 n.2. First, she argues that although the report was submitted as a "rebuttal" report, Levine neither reviewed nor responded to Plaintiff's expert reports. Id. In addition, she argues that Defendants failed to comply with Rule 26(a)(2)(B)'s requirement that expert reports include "the witness's qualifications, including a list of all publications authored in the previous 10 years." ECF No. 78-4 at 1 n.2. The CV provided by Defendants is dated December 1, 2008, and does not include all of Levine's qualifications or publications. ECF No. 80-2 at 9.

Rule 26(a)(2) governs disclosure of expert testimony that a party "may use at trial." But Levine is not currently a trial witness. In view of the streamlined and expedited nature of preliminary injunction proceedings, the Court will not strike Levine's report for noncompliance with the rules applicable in preparation for trial. See South Yuba River Citizens League v. National Marine Fisheries Service, 257 F.R.D. 607, 615 (E.D. Cal 2009); Midwest Guaranty Bank v. Guaranty Bank, 270 F. Supp. 2d 900, 908 n.2 (E.D. Mich. 2003).

**2.      Testimony Regarding Incarcerated Persons**

Norsworthy seeks an order striking Levine's testimony about prison culture and the

treatment that incarcerated persons with gender dysphoria should receive. ECF No. 78-4 at 5-11. She argues that Levine is not qualified to testify on this subject because he does not have any "skill, experience, training, or education" in the treatment of incarcerated patients. ECF No. 78-4 at 5; see Fed. R. Evid. 702. Furthermore, he does not cite research, experience, or evidence in the record to support his generalized statements about prison culture and Norsworthy's adaption to it. ECF No. 78-4 at 6. His opinions concerning differential treatment for incarcerated and non-incarcerated persons are unsupported by research (with the exception of one study, which he misrepresents), and are directly contradicted by the Standards of Care. Id. at 7-8. Instead, he relies on two unverified anecdotes: one he now concedes is false, see ECF No. 80-2 at 31, and the other involves a web posting "for diverse companionship," see Levine Decl. at 11. ECF No. 78-4 at 9.

Norsworthy's request that the Court strike this testimony is denied. Levine is a licensed psychiatrist and a Clinical Professor of Psychiatry at Case Western University School of Medicine. Levine Report at 1; ECF No. 51 at 4. His work has focused on issues relating to sexuality and gender, and he served as chairperson of the fifth edition of the Standards of Care.[3] Levine Report at 1; ECF No. 51 at 4-16. Levine has testified as an expert witness in three other cases involving transgender inmates, including Kosilek. Levine Report at 1. As a psychiatrist, it is appropriate for Levine to base his opinions on his personal experience and on his interview with Norsworthy. See Kumho Tire, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); id. at 150 ("In [some] cases, the relevant reliability concerns may focus upon personal knowledge or experience."); see also Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). The Court will consider factors including the lack of citations to research in Levine's report, the divergence between his opinion

---

[3] The Standards of Care are currently in their seventh edition. ECF No. 10-1.

and the Standards of Care, and his reliance on an anecdote he now admits is false in determining the weight to accord his testimony. It will "not exclude opinions merely because they are impeachable." City of Pomona, 750 F.3d at 1044.

### 3. Testimony Regarding Plaintiff's Health

Norsworthy also contends that Levine's opinions concerning the effects of hormone therapy on her physical health should be excluded because Defendants have presented no evidence that Levine has ever practiced general medicine or otherwise obtained any expertise on the effects of hormone therapy on the liver function of a patient with hepatitis C. ECF No. 78-4 at 11. Furthermore, she argues, his opinions are not supported by citations to medical research or the record, are contradicted by Gorton's report, and were not echoed in the declaration of Norsworthy's treating endocrinologist, Munir. Id. at 12.

Levine's CV indicates that he is a medical doctor who completed an internship in Internal Medicine at the University Hospitals of Cleveland. ECF No. 51 at 4. The Court concludes that this experience qualifies him to review Norsworthy's medical records and to offer an opinion about the risk to Norsworthy's liver function of continuing hormone therapy. Levine's opinions are not inadmissible on the basis that they differ from Gorton's and are not explicitly supported by Munir. Disagreements with other experts and witnesses, or differences in the experts' amounts of experience, go to the weight of Levine's testimony, not its admissibility.

### 4. Testimony Regarding Dr. Coffin's Qualifications

Levine's report states that Coffin was "qualified to opine on the medical necessity of SRS" for Norsworthy. Levine Report at 9. Norsworthy contends that this opinion should be stricken because Levine did not review Coffin's CV or deposition testimony; did not provide any support for the criteria he uses to evaluate Coffin's experience, which are contrary to the Standards of Care; relied on Coffin's attendance at his own CDCR presentation, which did not address medical necessity determinations; and did not respond to Ettner and Gorton's criticisms of Coffin. ECF No. 78-4 at 12-14.

As discussed above, Levine is a psychiatrist who focuses on gender and sexuality, and who has been involved in the development of the Standards of Care. He reviewed Coffin's report and

parts of Norsworthy's medical records, and personally interviewed Norsworthy. Under these circumstances, the Court concludes that his opinion about Coffin's qualifications is sufficiently reliable to pass muster under <u>Daubert</u>.

### 5. Testimony Regarding Plaintiff's Sexuality

Finally, Norsworthy contends that Levine's repeated suggestions that her sexual preferences and conduct are to blame for her victimization in prison, and specifically the gang rape in 2009, should be stricken. Norsworthy contends that these statements are "extremely hurtful and offensive," "totally irrelevant to Plaintiff's claims," "highly prejudicial against Plaintiff," and "serve[] no purpose but to confuse issues and waste time." ECF No. 78-4 at 14-15.

"It is well established that trial courts can consider otherwise inadmissible evidence in deciding whether or not to issue a preliminary injunction." <u>Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Services, Inc.</u>, No. 14-cv-09534, 2015 WL 294101, at *6 (C.D. Cal. Jan. 21, 2015) (citing <u>University of Texas v. Camenisch</u>, 451 U.S. 390, 395 (1981); <u>Flynt Distrib. Co.</u>, 734 F.2d at 1394; <u>Republic of the Philippines</u>, 862 F.2d at 1363). Moreover, although the statements in question undermine Levine's credibility, it is not clear that they are inadmissible.

The Court will not strike Levine's observations as irrelevant or prejudicial at this stage in the proceedings, where the risk of misleading or confusing a jury does not exist.

## IV. MOTION FOR PRELIMINARY INJUNCTION

### A. Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 20 (2008). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted)..

"A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter</u>,

23

555 U.S. at 24.  It may take two forms.  "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits."  <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.</u>, 571 F.3d 873, 878 (9th Cir. 2009) (internal alterations and quotation marks omitted).  A mandatory injunction orders a party to take action. <u>Id.</u> at 879.  Because a mandatory injunction "goes well beyond simply maintaining the status quo pendente lite [it] is particularly disfavored."  <u>Id.</u> (internal alterations omitted).  "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'"  <u>Id.</u> (quoting <u>Anderson v. United States</u>, 612 F.2d 1112, 1115 (9th Cir. 1980)).

Under the Prison Litigation Reform Act ("PLRA"):

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system.

18 U.S.C. § 3626(a)(2).

## B.    Discussion

### 1.    Likelihood of Success on the Merits

To obtain a preliminary injunction requiring Defendants to provide her SRS, Norsworthy must first establish that she is likely to succeed on the merits of her SRS claims.  She contends that Defendants violated 42 U.S.C. § 1983 by denying her medically necessary treatment for gender dysphoria in violation of the Eighth's Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's Equal Protection Clause.

#### a.    Deliberate Medical Indifference

##### i.    Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976) (internal citation omitted).  Such indifference may be

"manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id.  In the Ninth Circuit, a plaintiff alleging deliberate indifference must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle, 429 U.S. at 104) (internal quotation marks omitted).   Second, she "must show the defendant's response to the need was deliberately indifferent." Id.  This second prong "is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Id.  An inadvertent or negligent failure to provide adequate medical care does not suffice to state a claim under Section 1983. Estelle, 429 U.S. at 105-06.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Id. at 106.  "However, the Supreme Court has also recognized that while 'deliberate indifference' under Estelle requires more than a showing of mere negligence, 'something less than [a showing of] acts or omissions for the very purpose of causing harm or with knowledge that harm will result' will suffice." Mandala v. Coughlin, 920 F. Supp. 342, 353 (E.D.N.Y. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 835 (1994)).

### ii.   Serious Medical Need

Norsworthy is likely to succeed in establishing a serious medical need.  She has presented extensive and consistent evidence that, notwithstanding years of treatment in the form of hormone therapy and counseling, she continues to experience severe symptoms of gender dysphoria. See Norsworthy Dep. at 20-21, 87-88, 133; Ettner Decl. ¶¶ 69, 75.  The "psychological and emotional pain" Norsworthy experiences as a result of her gender dysphoria means that she is "unable to [] complete [her] existence or complete who [she is]." Norsworthy Dep. at 21. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) ("chronic and substantial pain" is an example of a serious medical need).

The WPATH Standards of Care explain that some individuals are unable to obtain relief from gender dysphoria without surgical intervention, and describes SRS as "essential and

25

medically necessary" for this group of patients. Standards of Care at 36. Defendants do not challenge Norsworthy's credibility or dispute that the WPATH Standards are the accepted standards of care for the treatment of transgender patients like Norsworthy. See De'lonta v. Johnson, 708 F.3d 520, 522-23 (4th Cir. 2013) (describing the Standards of Care as "the generally accepted protocols" for the treatment of gender dysphoria); Soneeya v. Spencer, 851 F. Supp. 2d 228, 231 (D. Mass. 2012) ("the course of treatment for Gender Identity Disorder generally followed in the community is governed by the 'Standards of Care'"); O'Donnabhain v. Comm'r of Internal Revenue, 134 T.C. 34, 65 (U.S. Tax Ct. 2010) (the Standards of Care are "widely accepted in the psychiatric profession"). Indeed, Defendants argue that a preliminary injunction is inappropriate in part because, in their view, Norsworthy does not meet the WPATH eligibility criteria. ECF No. 73 at 26.

Norsworthy's treating mental health care provider, Reese, who established a relationship with her over two years, unequivocally determined that she is in the group of patients for whom SRS is medically necessary. He explicitly stated that SRS is a "clinical and medical necessity for her health and well-being." ECF No. 68 at 14. Defendant's expert, Levine, agrees with Plaintiff that Reese is a "qualified mental health professional" for the purpose of making this assessment, and that a treating provider is better suited to evaluate a patient's level of distress over time than a visiting independent expert. Levine Report at 10; ECF No. 71 at 34; see also Zamora Dep. at 107. The reports of experts Ettner and Gorton, each of whom has extensive experience in treating gender dysphoric patients, confirm Reese's assessment and recommend that SRS should be provided immediately. Ettner Decl. ¶ 79; Gorton Decl. ¶ 38.

It seems that Ettner's recommendation means that Norsworthy has satisfied all of the eligibility criteria for SRS, as the record demonstrates: (1) her persistent gender dysphoria; (2) her capacity to make a fully informed decision and consent to treatment; (3) her majority; (4) that significant medical and mental health concerns are well controlled; (5) that she has received twelve continuous months of hormone therapy; (6) that she has lived in a female gender role for twelve continuous months; and (7) that two qualified mental health professionals have

recommended SRS after independent evaluations.[4]  See Standards of Care at 39.

Defendants do not dispute that untreated symptoms of gender dysphoria can constitute a serious medical need.  See Kosilek v. Spencer, 774 F.3d 63, 86 (1st Cir. 2014) (en banc).  Rather, Defendants argue that the hormone therapy and mental health treatment provided by CDCR since 2000 has alleviated Norsworthy's distress, and that she is not entitled to "any particular type of treatment" for her gender dysphoria.  ECF No. 73 at 13-14 (citing Meriwether v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987)).  Furthermore, Defendants argue, Norsworthy has not demonstrated that SRS is medically necessary at the present time, because she has not shown that she will suffer severe emotional distress or resort to self-mutilative behavior if she is denied SRS.  ECF No. 73 at 14.  In support of these arguments, Defendants rely on Levine's report and, in particular, his opinion that "sex reassignment surgery is always an elective procedure."  Levine Report at 25.

The Court is not persuaded by these arguments.  "Just because [defendants] have provided [a prisoner] with *some* treatment consistent with the [] Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment."  De'lonta, 708 F.3d at 526 (emphasis in original); see also Fields v. Smith, 653 F.3d 550, 556 (7th Cir. 2011); Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989) (a plaintiff alleging deliberate medical indifference "need not prove complete failure to treat").  As the Fourth Circuit has explained:

> By analogy, imagine that prison officials prescribe a painkiller to an inmate who has suffered a serious injury from a fall, but that the inmate's symptoms, despite the medication, persist to the point that he now, by all objective measure, requires evaluation for surgery. Would prison officials then be free to deny him consideration for surgery, immunized from constitutional suit by the fact that they were giving him a painkiller?  We think not.  Accordingly, although . . . a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need.

---

[4] The First Circuit has opined that there is "no material difference" between a provider's letter confirming eligibility, but not recommending SRS, and "what the Standards of Care refers to as a letter of recommendation."  Kosilek v. Spencer, 774 F.3d 63, 88 (1st Cir.) (en banc).  Under this view, providers who have confirmed that Norsworthy is ready for surgery but have stopped short of recommending it as necessary might also be viewed as recommenders.

De'Lonta, 708 F.3d at 526.

Moreover, Defendants have provided no credible support for the idea that Norsworthy must demonstrate that she is likely to commit suicide or attempt auto-castration in order to demonstrate a serious medical need, or that her claim fails because she has survived for decades without SRS. A plaintiff demonstrates a "serious medical need" when she establishes that failure to treat her condition could result in further significant injury or the unnecessary and wanton infliction of pain. See Estelle, 429 U.S. at 104; Jett, 439 F.3d at 1096. She is not required to demonstrate that she is at risk of death or imminent self-harm, or that her risk of injury or pain is new. Norsworthy is likely to succeed in establishing that she has experienced decades of severe psychological pain because SRS is the only way to treat her persistent symptoms of gender dysphoria. The fact that she has not yet received SRS does not lessen her need for it now.

The Court gives very little weight to the opinions of Levine, whose report misrepresents the Standards of Care; overwhelmingly relies on generalizations about gender dysphoric prisoners, rather than an individualized assessment of Norsworthy; contains illogical inferences; and admittedly includes references to a fabricated anecdote. With respect to the Standards of Care, Levine represents that they "assert that a real life experience living in society as a woman should be done for at [least] one year prior to SRS" and suggests that the Standards do not "govern the treatment of long term inmates who consolidate a female gender identity." Levine Report at 6, 24. In his view, while some experts "interpret" the Standards to mean that "institutionalized individuals should have the same right to treatment for Gender Dysphoria that community dwelling individuals possess," this is not an accurate interpretation. Id. at 6. But the Standards of Care require "12 continuous months of living in a gender role that is congruent with the patient's identity," which Levine concedes that Norsworthy has experienced, not a year of living *in society* as a woman. Standards of Care at 39; Levine Report at 24. Furthermore, the Standards explicitly apply "in their entirety" to all transsexual people, "irrespective of their housing situation," and "including institutional environments such as prisons." Standards of Care at 43. They make clear that "[d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations." Id. at 44.

Levine's report concludes generally that "SRS is always an elective procedure," that "[g]ender dysphoria is not comparable to physical pain," and that "severe" gender dysphoria "is not the same meaning as severe pain." Levine Report at 11, 22, 25. He also suggests that because incarcerated people do not have the "opportunity to live in free society" in a gender role congruent with their gender identity; because they often have "psychiatric co-morbidity" (i.e. other diagnoses relevant to their mental health"); and because SRS might "induce a different types [sic] of pain" by "taking away a long term incarcerated inmate's life purpose, quest, hope for the future, and reason to live," it would never be medically prudent to provide SRS to an inmate. Id. at 5-6, 8. To the extent that Levine's apparent opinion that no inmate should ever receive SRS predetermined his conclusion with respect to Norsworthy, his conclusions are unhelpful in assessing whether she has established a serious medical need for SRS.

Setting aside these general concerns with Levine's report, the Court concludes that his opinion is not credible because of illogical inferences, inconsistencies, and inaccuracies in the report. For example, Levine states that one reason that Norsworthy should not receive SRS is that "[n]ot having SRS would prevent . . . another rape, or a sexually transmitted disease." Id. at 10. Levine reports that Norsworthy has been raped on six occasions, including one 2009 incident in which nine inmates assaulted her over a period of six hours, and that she has hepatitis C, apparently from the 2009 gang rape. Levine Report at 18, 20. It seems clear that denying Norsworthy SRS is not protecting her from rape or sexually transmitted diseases. In another part of the report, Levine suggests that "transition to femaleness is an adaptive response to long term incarceration," and speculates that if she is released, Norsworthy's gender identity might change. Id. 25. But in describing his interview with Norsworthy, he reports, "We agreed that her gender identity was consolidated as feminine and is likely to remain so within or outside of prison." Id. at 15. Levine offers no explanation for this discrepancy. Perhaps most concerningly, Levine bases his opinions about the prudence of providing SRS to incarcerated patients in part on his statement that, "I know of only one inmate in the US who has had SRS while in custody. This California inmate's mental health dramatically deteriorated." Id. at 6. In a footnote, Levine explains, "The inmate was presented to me when I gave a workshop to CDCR mental health professionals in

2012." Id. at 6 n.3.  But, as Levine has now confirmed, no CDCR inmate has *ever* received SRS. ECF No. 80-2 at 31.

The Court concludes that these serious weaknesses in Levine's report undermine his credibility as an expert and foreclose the conclusion that his opinions refute Norsworthy's compelling evidence of her serious medical need for SRS.

### iii.    Deliberate Medical Indifference

Norsworthy is also likely to succeed in establishing that prison officials were deliberately indifferent to her serious medical need.  "[D]eliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm."  Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003) (citing Farmer, 511 U.S. at 842).

Here, Norsworthy has presented compelling evidence suggesting that prison officials deliberately ignored her continuing symptoms of gender dysphoria and the recognized standards of care; that they were deliberately indifferent to the recommendations of her treating health care provider; that CDCR's reasons for denying SRS are pretextual; and that CDCR has a blanket policy against providing SRS for transgender inmates.

Norsworthy's appeal stated that she required SRS to "alleviate [her] pain and suffering," and that she "suffers greatly w/out gender reassignment surgery."  ECF No. 68 at 5, 6.  She attached documents from her medical file confirming her ongoing symptoms, and Defendants had access to her entire medical file.  See id. at 2-53.  Defendants also had access to information relating to Norsworthy's hepatitis C status.  Norsworthy included materials in her appeal that referred Defendants to the WPATH Standards of Care and the Kosilek decision, in which a district court judge in Massachusetts had found that prison officials violated a transgender inmate's Eighth Amendment rights by failing to provide SRS when it was medically indicated under the WPATH Standards.[5]  Id.  Despite access to the relevant Standards of Care and evidence that SRS was medically necessary for Norsworthy, Defendants failed to provide her SRS, or to refer her to a

---

[5] The First Circuit's decision reversing the district court was not issued until December 2014, after Defendants' denial of Norsworthy's appeal.

specialist for further evaluation. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).

In addition, Norsworthy has established that Defendants chose to ignore the clear recommendations of her mental health provider, Reese, that SRS was medically necessary. Instead of following his recommendations, they removed her from his care. "[A] prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon." Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999); see also Estelle, 429 U.S. at 104-05 (prison officials act with deliberate indifference when they intentionally interfere with treatment once prescribed); Lopez, 203 F.3d at 1132 (a prisoner "can establish deliberate indifference by showing that officials intentionally interfered with his medical treatment").

Norsworthy is likely to succeed in establishing that CDCR's stated reasons for denying her SRS are pretextual. First, the evidence suggests that Coffin's evaluation was designed to support the denial of SRS. Coffin was chosen to perform the evaluation because he had attended a training at which Levine instructed participants that SRS should never be provided to incarcerated patients. Coffin omitted several important indicators of medical necessity in his report and reached conclusions that are at odds with the Standards of Care. Specifically, he expressed that SRS would not be appropriate for Norsworthy because although she had been living "as much as a female as permitted in a male institution in CDCR, it is unclear whether or not [her] decision regarding SRS would change following release." Coffin Eval. at 19. The implication that an incarcerated person should never receive SRS because she has not had the opportunity to live outside prison in a gender role that is congruent with her gender identity is inconsistent with the Standards' explicit rejection of the idea that SRS should be denied to a patient on the basis that she lives in an institutional environment. Standards of Care at 44. See Hamilton v. Endell, 981 F.2d 1062, 1067 (9th Cir. 1992) ("By choosing to rely upon a medical opinion which a reasonable person would likely determine to be inferior, the prison officials took actions which may have amounted to the denial of medical treatment, and the 'unnecessary and wanton infliction of pain.'"), overruled in part on other grounds as recognized in Colwell v. Bannister, 763 F.3d 1060, 1069 (9th Cir. 2014). As Ettner convincingly explains in her declaration, it is clear from Coffin's deposition that he has "a profound misunderstanding of, and lack of scientific information

regarding, the nature, assessment, and treatment of gender dysphoria." Ettner Decl. ¶ 86; see id. ¶¶ 87-94 (describing Coffin's use of male pronouns to refer to a female gender dysphoric patient; implication that gender dsyphoria is an "alternate lifestyle" or the result of a developmental disruption; conflation of gender identity and sexual orientation; opinion that self-mutilation, suicidality, and severe mental illness are indicators that SRS is medically necessary; and lack of familiarity with the WPATH Standards of Care and relevant research).

Second, Zamora denied Norsworthy's appeal at the third level of review on the basis that her "current providers have documented the determination that the subject surgery is not medically necessary for you." ECF No. 68 at 3. There is no support for this statement in the record. There is no evidence that any provider, as distinguished from an independent evaluator, has ever determined that SRS is not medically necessary for Norsworthy. Zamora, who has no health care training, was unable to identify any other occasion in which a primary care provider's treatment plan was overridden by the appeals process. Zamora Dep. at 39-43.

The evidence suggests that Norsworthy's request for SRS was denied because CDCR has a blanket policy barring SRS as a treatment for transgender inmates. See Colwell, 763 F.3d at 1071 (defendants not entitled to summary judgment where "[a] reasonable jury could find that [prison] officials denied treatment because [plaintiff's] medical need conflicted with a prison policy, not because non-treatment was a medically acceptable option."). The Department Operations Manual, which Defendants indicate is a source considered in the appeals process, indicates that "[s]urgical procedure shall not be the responsibility of the Department." ECF No. 71 at 115. Norsworthy testified that she was repeatedly informed by her health care providers that SRS was not available to inmates. Norsworthy Dep. at 154-55. Kohler testified that there was an "understanding" that it would not be available. Kohler Dep. at 45. This "understanding" is reflected in CDCR's guidelines for treating transgender inmates, which do not mention SRS as a treatment option, and the 2012 training provided to CDCR staff by Levine, which indicated that SRS should never be provided to incarcerated patients. See ECF No. 68 at 46-52; ECF No. 71 at 44-46.

Defendants point to Section 3350.1, which, they contend, authorizes vaginoplasty when it is determined to be "clinically necessary" after individualized review. ECF No. 73 at 20-21. This

regulation, they argue, supersedes any contrary policies in the Department Operations Manual, which does not have the force of law, and establishes that CDCR's governing policy is to provide any surgery that is clinically necessary, prescribed by an appropriate treating health care professional, and approved by a medical committee. But the evidence suggests that, in practice, health providers and administrative reviewers understood that SRS was not available, and that their decisions about Norsworthy's care were informed by this understanding rather than an individualized assessment of her medical need for SRS.

Defendants rely heavily on Kosilek v. Spencer, 774 F.3d 63 (1st Cir. 2014) (en banc), in which the First Circuit, sitting en banc, reversed the decisions of the trial court and a panel of the First Circuit finding that denial of SRS violated the plaintiff's Eighth Amendment rights. Kosilek is not binding on this Court. In any event, the First Circuit acknowledged in Kosilek that "any [blanket] policy [barring SRS] would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs." 774 F.3d at 91. And although the court in Kosilek held that the defendants were not deliberately indifferent to a transgender inmate's medical needs where they chose between "two alternative courses of medical treatment" that "both alleviate negative effects within the boundaries of modern medicine," 774 F.3d at 90, the evidence does not suggest that, in this case, Defendants made a professional medical judgment in choosing between two possibilities or that there was a difference of opinion between a prisoner and her provider or between providers. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989) ("A difference of opinion does not amount to a deliberate indifference to [] serious medical needs."). Rather, it appears the CDCR overrode the recommendation of Norsworthy's treating mental health provider by deliberately seeking out a contrary opinion. This approach is not endorsed by Kosilek. See Kosilek, 774 F.3d at 90 n. 12 ("This holding in no way suggests that correctional administrators wishing to avoid treatment need simply to find a single practitioner willing to attest that some well-accepted treatment is not necessary. We do not establish here a per se rule allowing a dissenting medical opinion to carry the day.").[6]

---

[6] The Court expresses no view now as to whether Kosilek was otherwise correctly decided on its facts.

33

United States District Court
Northern District of California

Although Defendants characterize this as a case where CDCR physicians have so far determined that SRS is not medically necessary, or even necessarily advisable, the evidence presented does not support their position. Indeed, there is no evidence that any treating medical or mental health provider has ever determined that SRS is not medically necessary for Norsworthy. Defendants rely on the opinions of Coffin and Levine (both of whom agree that SRS would alleviate Norsworthy's symptoms, although they conclude that it is not necessary), but these opinions are inconsistent with the Standards of Care, based on the unsupported assumption that SRS should never be available to incarcerated patients, and convincingly refuted by Plaintiff's experts. The weight of the evidence demonstrates that for Norsworthy, the only adequate medical treatment for her gender dysphoria is SRS, that the decision not to address her persistent symptoms was medically unacceptable under the circumstances, and that CDCR denied her the necessary treatment for reasons unrelated to her medical need. See Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) ("[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to [the prisoner's] health." (internal quotation marks omitted)). This is not a "doubtful case[]." Anderson, 612 F.2d at 1115.

### b. Equal Protection

Norsworthy also contends that Defendants violated her rights under the Equal Protection Clause by treating her differently from similarly situated cisgender inmates seeking vaginoplasty. ECF No. 62 at 24. Because the Court concludes that Norsworthy is likely to succeed on the merits of her Eighth Amendment deliberate medical indifference claim and that a preliminary injunction enjoining Defendants to provide SRS is appropriate on that basis, the Court need not consider her likelihood of success on the Equal Protection claim.

### 2. Irreparable Harm

Norsworthy has also established that she is currently suffering irreparable harm and that it will likely continue in the absence of a preliminary injunction. Norsworthy testified that she suffers continued and "excruciating" "psychological and emotional pain" as a result of her gender

dysphoria. Norsworthy Dep. at 20, 87-88. Emotional distress, anxiety, depression, and other psychological problems can constitute irreparable injury. See Chalk v. U.S. Dist. Ct. Cent. Dist. of California, 840 F.2d 701, 709 (9th Cir. 1988); Stanley v. University of Southern California, 13 F.3d 1313, 1324 n.5 (9th Cir. 1994). Norsworthy is at risk of significant worsening of her gender dysphoria in the event that her hormone therapy must again be modified or discontinued because of liver complications. The combination of Norsworthy's severe gender dysphoria and hepatitis C means that her current treatment plan creates serious risk for both her physical and psychological health.

Furthermore, the deprivation of Norsworthy's constitutional rights under the Eighth Amendment is itself sufficient to establish irreparable harm. See Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); Nelson v. Nat'l Aeronautics & Space Admin, 530 F.3d 865, 882 (9th Cir. 2008), rev'd on other grounds, 562 U.S. 134 (2011) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."); Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267, 1282 (N.D. Cal. 2014) ("Irreparable harm is presumed if plaintiffs are likely to succeed on the merits because a deprivation of constitutional rights always constitutes irreparable harm.").

Defendants' contention that Norsworthy cannot establish irreparable injury because "she can point to no relevant circumstances that make the provision of [SRS] suddenly urgent" is unpersuasive. ECF No. 73 at 25. Defendants cite no authority for the proposition that a patient denied medically necessary treatment is not suffering "irreparable harm" when her serious condition is not properly treated over a period of years or decades. See McNearney v. Washington Department of Corrections, No. 11-cv-5930 RBL/KLS, 2012 WL 3545267, at *14 (W.D. Wash. 2012) (finding a likelihood of irreparable injury where plaintiff's medical condition predated her incarceration and had not worsened, but the evidence showed that she continued to suffer unnecessary pain due to defendants' inadequate treatment plan). Indeed, the record supports the conclusion that Norsworthy's need for SRS has been a matter of long-standing, not sudden, urgency. The continuation of this suffering constitutes irreparable injury, whether this is the first

1    month she has suffered it or the hundredth.

2         **3.    Balance of the Equities**

3         In considering the equities of a preliminary injunction, courts "must balance the competing

4    claims of injury and must consider the effect on each party of the granting or withholding of the

5    requested relief." Winter, 555 U.S. at 24. " In exercising their sound discretion, courts of equity

6    should pay particular regard for the public consequences in employing the extraordinary remedy

7    of injunction." Id. The balance of the equities favors Norsworthy's requested relief. She has

8    established that she is suffering and is likely to continue to suffer unnecessary pain if she is denied

9    SRS. None of the considerations raised by Defendants outweigh her interest.

10        Defendants first argue that the balance tips in their favor because Norsworthy has not

11   shown that her distress has increased from the distress she has experienced over the past fifteen

12   years. As explained above, a plaintiff's irreparable injury does not need to be new to be relevant.

13        Furthermore, the evidence contradicts Defendants' contention that Norsworthy does not

14   meet the WPATH eligibility criteria for SRS. ECF No. 73 at 26. Defendants state that

15   Norsworthy has not had any time, let alone twelve months, of continuous living in the female

16   gender role in society, but this is not a requirement. The Standards of Care clearly state that

17   patients should have "12 continuous months of living in a gender role that is congruent with the

18   patient's identity." Standards of Care at 39. Norsworthy exceeds this requirement because she

19   has lived as a woman since the 1990's. The standards "in their entirety apply to all transsexual,

20   transgender, and gender-nonconforming people, irrespective of their housing situation," and

21   "including institutional environments such as prisons." Id. at 43. There is no requirement that a

22   transsexual patient live for twelve months in his or her gender role outside of prison before

23   becoming eligible for SRS. It also appears that Norsworthy now satisfies the requirement that she

24   must receive two independent clinical evaluations recommending SRS, as SRS has been

25   unequivocally recommended by both Reese and Ettner.

26        The Court is not persuaded that CDCR's safety and security concerns override

27   Norsworthy's interest in receiving constitutionally adequate care. CDCR may not have experience

28   housing an inmate undergoing SRS, but it does have experience housing inmates who require

surgery and housing one post-operative male-to-female transsexual individual. Any suggestion that housing a female inmate with a history of violence against women would be a novel security challenge is hard to square with the fact that CDCR already houses many women with a history of violence, including violence against their female partners.

The Court takes seriously Defendants' concern that a preliminary injunction providing SRS potentially deprives them of appellate review. However, Norsworthy has established that she is likely to succeed on the merits of her claims and that she is suffering from irreparable injury as a result of the deprivation of her Eighth Amendment rights. Consequently, the Court concludes that the balance of hardships tips heavily in her favor.

### 4. Public Interest

The Court concludes that an injunction is in the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012); see also United States v. Raines, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees."). "In addition, 'the public has a strong interest in the provision of constitutionally-adequate health care to prisoners.'" McNearney, 2012 WL 3545267, at *16 (quoting Flynn v. Doyle, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009)). There is no public interest in Norsworthy's continued suffering during the pendency of this litigation.

The evidence in this case belies Defendants' claim that an injunction is not in the public interest because Norsworthy is asking the Court "to disregard the reasoned opinion of medical and mental health professionals most familiar with her care." ECF No. 73 at 27. The only people who have determined that SRS is not medically necessary are Coffin and Levine, each of whom met Norsworthy on one occasion and can hardly be described as the health care professionals "most familiar with her care." Norsworthy is not seeking to "short-circuit the prison's internal processes for medical treatment." Id. She is seeking access to the medical treatment prescribed by her treating provider and denied for administrative, rather than medical, reasons. As discussed above, Defendants' security concerns are unpersuasive. The Court therefore also disagrees that "[t]he public's interest in orderly prison administration dictates that Norsworthy's motion should be

denied." ECF No. 73 at 28.

### 5. PLRA

Norsworthy has established that she is likely to succeed on the merits of her Eighth Amendment claim, that she is likely to suffer irreparable harm without an injunction, that the balance of the equities tips in her favor, and that an injunction is in the public interest. An injunction granting her access to adequate medical care, including referral to a qualified surgeon for SRS, is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation. See 18 U.S.C. § 3626. There is no evidence that granting this relief will have "any adverse impact on public safety or the operation of the criminal justice system." 18 U.S.C. § 3626(a)(2).

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is granted. Defendants are ordered to provide Plaintiff with access to adequate medical care, including sex reassignment surgery. Defendants shall take all of the actions reasonably necessary to provide Norsworthy sex reassignment surgery as promptly as possible. Defendant's request for judicial notice is granted. Plaintiff's evidentiary objection and motion to strike is denied.

The Court also sets the matter for a further Case Management Conference on Wednesday, May 13, 2015, at 2:00 p.m. The parties must file a Joint Case Management Statement by May 6, 2015.

IT IS SO ORDERED.

Dated: April 2, 2015

_____
JON S. TIGAR
United States District Judge